**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

YURMAN STUDIO, INC. and YURMAN        :     Civil Action No. 07-1241 (SAS)(HP)
DESIGN, INC.,                                  :     (Action No. 1)

              Plaintiffs/Counter-Defendants,    :

          - against -                       :

ELENA CASTANEDA and EJEWELER LLC    :
d/b/a OVERSTOCKJEWELER.COM,          :

             Defendants/Counter-Plaintiffs.    :

                                            :

------------------------------------------------------------ x
------------------------------------------------------------ x

CARTIER, a division of RICHEMONT NORTH   :     Civil Action No. 07-7862 (SAS)(HP)
AMERICA, INC., CARTIER INTERNATIONAL,   :     (Action No. 2)
N.V., CARTIER CREATION STUDIO, S.A., VAN : 
CLEEF & ARPELS S.A., VAN CLEEF &          :
ARPELS, INC., VAN CLEEF & ARPELS        :
DISTRIBUTION, INC., GUCCI AMERICA, INC.,   :
and BULGARI S.p.A.,                     :

               Plaintiffs,                   :

          - against -                       :

ELENA CASTANEDA and EJEWELER LLC    :
d/b/a OVERSTOCKJEWELER.COM,          :

             Defendants.                :

------------------------------------------------------------ x

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

ARNOLD & PORTER LLP
399 Park Avenue
New York, New York 10022
(212) 715-1000

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................ 1

ARGUMENT .................................................................................... 2

I.    THIS COURT HAS JURISDICTION OVER PLAINTIFFS' COPYRIGHT
      INFRINGEMENT CLAIMS ........................................................ 2

      A.    Yurman's, Gucci's and Bulgari's United States "Collections" Copyright
            Registrations Are Valid ................................................... 3

      B.    Cartier and Van Cleef & Arpels Have Standing to Assert
            Infringement Claims Based On French Copyrights ...................... 5

      C.    Bulgari's Copyright Registrations Cover the Jewelry Designs At Issue ........... 8

II.   THERE ARE GENUINE ISSUES OF MATERIAL FACT THAT
      PRECLUDE SUMMARY JUDGMENT ON THE REMAINDER OF
      PLAINTIFFS' CLAIMS ............................................................. 10

      A.    Whether Defendants' Pervasive Use of Plaintiffs Trademarks
            Constitutes a Nominative Fair Use Is An Issue of Fact to be
            Resolved By the Jury ..................................................... 11

      B.    Whether There is a Likelihood of Confusion is a Fact-Intensive
            Analysis that Cannot be Determined on Summary Judgment ............ 14

      C.    Defendants Are Not Entitled to Summary Judgment on
            Plaintiffs' Federal Trademark Dilution Claims ......................... 21

      D.    Defendants Have Willfully Infringed Plaintiffs'
            Copyrights and Trademarks .............................................. 22

      E.    Plaintiffs Have Standing to Assert False Advertising Claims ........... 23

      F.    Defendants Have Engaged In Deceptive Trade Practices ................ 24

CONCLUSION .................................................................................. 25

## TABLE OF AUTHORITIES

*Cases*                                                                                                    ***Page***

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ................................................................................ 2

*Cartier, Inc. v. Deziner Wholesale LLC*,
   55 U.S.P.Q.2d 1131 (S.D.N.Y. 2000) ....................................................... 17

*Chambers v. Time Warner*,
   282 F.3d 147 (2d Cir. 2002) ......................................................... 12, 13, 14

*Chambers v. Time Warner*,
   2003 WL 749422 (S.D.N.Y. Mar. 5, 2003) ............................................. 12

*Christopher Phelps & Assocs., LLC v. Galloway*,
   492 F.3d 532 (4th Cir. 2007) ..................................................................... 8

*Cosmetically Sealed Indust., Inc. v. Chesebrough-Pond's USA Co.*,
   125 F.3d 28 (2d Cir. 1997) ...................................................................... 13

*E. Am. Trio Prods. v. Tang Elec.*,
   97 F. Supp. 2d 395 (S.D.N.Y. 2000) ....................................................... 10

*E.G.L. Gem Lab Ltd. v. Gem Quality Institute, Inc.*,
   90 F. Supp. 2d 277 (S.D.N.Y. 2000) ....................................................... 21

*EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos, Inc.*,
   228 F.3d 56 (2d Cir. 2005) ...................................................................... 13

*Greenwich Film Prods., S.A. v. DRG Records, Inc.*,
   833 F. Supp. 248 (S.D.N.Y. 1993) .......................................................... 10

*Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*,
   219 F.3d 104 (2d Cir. 2000) ............................................................... 17, 18

*Horphag Research Ltd. v. Pellegrini*,
   328 F.3d 1108, *rev'd on other grounds*, 337 F.3d 1036 (9th Cir. 2003) .............................. 17

*Invicta Plastics Ltd. v. Mego Corp.*,
   523 F. Supp. 619 (S.D.N.Y. 1981) .......................................................... 17

*Itar-Tass Russian News Agency v. Argumenty I Fakty*,
   153 F.3d 82 (2d Cir. 1998) ........................................................................ 6

*Kay Berry v. Taylor Gifts, Inc.*,
    421 F.3d 199 (3rd Cir. 2005) ....................................................................... 3, 4, 5

*Levine v. McDonald's Corp.*,
    735 F. Supp. 92 (S.D.N.Y. 1990) ...................................................................... 2

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*,
    799 F.2d 867 (2d Cir. 1986) ............................................................................ 15

*Lorillard Tobacco Co., Inc. v. A&E Oil, Inc.*,
    503 F.3d 588 (7th Cir. 2007) ........................................................................... 23

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*,
    81 U.S.P.Q.2d 1064 (E.D. Va. 2006) ............................................................... 22

*Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*,
    425 F. Supp. 2d 402 (S.D.N.Y. 2006) ......................................................... 12, 14

*New Kids on the Block v. News Am. Publ'g, Inc.*,
    971 F.2d 302 (9th Cir. 1992) ............................................................. 11, 12, 13, 14

*New York Mercantile Exch., Inc. v. Intercontinentalexchange, Inc.*,
    389 F. Supp. 2d 527 (S.D.N.Y. 2005) ............................................................. 13

*Oswego Laborer's Local 214 Pension Fund v. Marine Midland Bank, N.A.*,
    85 N.Y.2d 20 (1995) ....................................................................................... 24

*Polaroid Corp. v. Polarad Elecs. Corp.*,
    287 F.2d 492 (2d Cir.), *cert denied*, 368 U.S. 820 (1961) ........................... 15, 18

*Rogers v. Koons*,
    960 F.2d 301 (2d Cir. 1992) .............................................................................. 5

*Savin Corp. v. Savin Group*,
    391 F.3d 439 (2d Cir. 2004) ............................................................................ 20

*Securitron Magnalock Corp. v. Schnabolk*,
    65 F.3d 256 (2d Cir. 1995) .............................................................................. 24

*Sports Traveler, Inc. v. Advance Magazine Publishers, Inc.*,
    1997 WL 137443 (S.D.N.Y. 1997) .................................................................. 24

*S&L Vitamins, Inc. v. Australian Gold, Inc.*,
    521 F. Supp. 2d 188 (E.D.N.Y. 2007) ......................................................... 12, 14

*The Sports Auth., Inc. v. Prime Hospitality Corp.*,
   89 F.3d 955 (2d Cir. 1996) ........................................................................ 14, 15

*Van Cleef & Arpels Logistics, S.A. v. Landau Jewelry*,
   547 F. Supp. 2d 356 (S.D.N.Y. 2008) ............................................................ 3

*Williams v. Crichton*,
   84 F.3d 581 (2d Cir. 1996) ............................................................................ 3

*Yurman Design, Inc. v. Paj, Inc.*,
   262 F.3d 101 (2d Cir. 2001) .......................................................................... 3

**Secondary Sources**

Jean-Luc Piotraut, *An Author's Right-Based Copyright Law:*
   *The Fairness and Morality of French and American Law Compared*,
   24 Cardozo Arts & Ent. L.J. 549 (2006) ........................................................ 6

*McCarthy on Trademarks* § 27:59 ...................................................................... 24

**Rules and Statutes**

Fed. R. Civ. P. 56(c) ............................................................................................ 2

15 U.S.C. § 1125(a) ............................................................................................ 23

17 U.S.C. § 102 .................................................................................................... 2

17 U.S.C. § 201(b) ............................................................................................... 6

17 U.S.C. § 408(a) ............................................................................................... 4

17 U.S.C. § 408(c) ............................................................................................ 4, 8

17 U.S.C. § 410(c) ............................................................................................... 5

16 C.F.R. Part 23 § 23.1 ...................................................................................... 25

16 C.F.R. § 233.4 ................................................................................................. 25

37 C.F.R. § 202.3(b)(4)(A) ............................................................................... 4, 5

37 C.F.R. § 202.3(b)(6)-(10) ............................................................................... 4

N.Y. Gen. Bus. Law § 349 ............................................................................... 24, 25

Registration of Claims to Copyright, 43 Fed. Reg. 965, 966 (Jan. 5, 1978)................................. 4

Trademark Dilution Revision Act of 2006, PUB. L. 109-312,
120 Stat. 1730 (codified in relevant part at 15 U.S.C. § 1125(c)(1) .................................... 22

French Intellectual Property Code Article L. 113-5 .................................................................... 6

French Intellectual Property Article L.113-2(2) ......................................................................... 7

Plaintiffs Yurman Studio, Inc., Yurman Design, Inc. ("Yurman"), Cartier, a division of Richemont North America, Inc., Cartier International, N.V., Cartier Creation Studio, S.A. ("Cartier"), Van Cleef & Arpels S.A., Van Cleef & Arpels, Inc., Van Cleef & Arpels Distribution, Inc. ("Van Cleef & Arpels"), Gucci America, Inc. ("Gucci") and Bulgari S.p.A. ("Bulgari") (collectively "Plaintiffs") respectfully submit this memorandum in opposition to defendants Elena Castaneda ("Castaneda") and Ejeweler LLC d/b/a Overstockjeweler.com ("Overstock") (collectively "Defendants")'s motion for partial summary judgment.

## PRELIMINARY STATEMENT

Defendants' moving target of a summary judgment motion is a waste of the Court's time and Plaintiffs' money. Realizing after the pre-motion conferences that their motion grounds were without merit, Defendants, in direct violation of this Court's individual rules, now state *six new grounds* for summary judgment, none more meritorious than the grounds they replaced. Moreover, despite this Court's warning at the second pre-motion conference that it has been known to sanction attorneys for pursuing futile summary judgment motions, Defendants persist in moving on grounds that they were strongly urged not to pursue, as these grounds inherently present issues of fact. All of this, of course, is to deflect attention from the real issue — should Defendants be permitted to continue to maintain their insidious website, the entire business model of which is to knock off Plaintiffs' famous designs and counterfeit their iconic brand names, on the excuse that Defendants are simply using Plaintiffs' designs as "inspiration" for their copycat jewelry, and Plaintiffs' trademarks for lawful comparative advertising.

The Court should deny Defendants' motion for partial summary judgment on all grounds, and sanction Defendants and their counsel for continually flouting this Court's rules and putting the Court and Plaintiffs through needless and wasteful exercises.

The relevant facts are set forth in detail in the accompanying Counter-Statement of

Material Facts, and in the declarations of Bharat Dube, Esq. on behalf of Cartier, Frederic Gilbert-Zinck on behalf of Van Cleef & Arpels, Maria Augusta Fioruzzi, Esq. on behalf of Bulgari and Louis S. Ederer, Esq., as well as the exhibits attached thereto.

ARGUMENT

A motion for summary judgment may only be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The "'fundamental maxim' is that the 'court cannot try issues of fact;' it can only determine whether there are issues to be tried." *Levine v. McDonald's Corp.*, 735 F. Supp. 92, 95 (S.D.N.Y. 1990) (citation omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Moreover, in determining whether a genuine issue has been raised, "a court must resolve all ambiguities and draw all inferences against the moving parties." *Levine*, 735 F.Supp. at 95. Thus, summary judgment is properly granted *only* where the evidence, with all ambiguities and inferences resolved in plaintiffs' favor, is such that a reasonable jury could not return a verdict in favor of the non-moving party. *Anderson*, 477 U.S. at 248, 255.

As noted above, Defendants' arguments are either totally baseless as a matter of law, or implicate classic fact disputes that the Court cannot decide on summary judgment. The Court should deny Defendants' motion for partial summary judgment in all respects.

## I.    THIS COURT HAS JURISDICTION OVER PLAINTIFFS' COPYRIGHT INFRINGEMENT CLAIMS

"Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression . . . . Works of authorship include . . . sculptural works." 17 U.S.C. § 102.

Sculptural works include jewelry designs. *See, e.g., Yurman Design, Inc. v. Paj, Inc.*, 262 F.3d 101, 108-10 (2d Cir. 2001). Under the Copyright Act, a party seeking to establish infringement must prove (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original. *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir. 1996). In the case of jewelry design, copyright protection extends to unique combinations of design elements, even if the elements themselves are common. *See, e.g., Van Cleef & Arpels Logistics, S.A. v. Landau Jewelry*, 547 F. Supp. 2d 356 (S.D.N.Y. 2008).

In light of Defendants' admitted slavish copying of Plaintiffs' respective copyrighted designs, Defendants have been left with no other option than to attack the validity and ownership of Plaintiffs' copyrights. Defendants' arguments, however, are off base as a matter of law, and summary judgment should be denied.

**A.     Yurman's, Gucci's and Bulgari's United States "Collections" Copyright Registrations Are Valid**

Several of the copyright registrations relied on in this case by Yurman, Gucci and Bulgari cover "collections" of jewelry designs, rather than single designs. Collection registrations are completely valid and cover each individual design in the collection. Making an argument unprecedented in the history of copyright law, however, and relying exclusively, and erroneously, on the Third Circuit's decision in *Kay Berry v. Taylor Gifts, Inc.*, 421 F.3d 199 (3rd Cir. 2005), Defendants contend that Yurman's, Gucci's and Bulgari's collection registrations are invalid because the "U.S. Copyright Office lacks the authority to issue a '*group*' registration on jewelry [designs]". Defs' Br. at 7 (emphasis added). In effect, Defendants are arguing that the Copyright Office, in issuing collection registrations for all types of works over the last thirty-two years, has exceeded its authority, and every collection registration ever issued should be declared invalid. The fatal flaw in Defendants' argument, and the reason why it has never been made before, is that

the Yurman, Gucci and Bulgari collection registrations are *not* group registrations, but rather

"single work" registrations expressly authorized under 37 C.F.R. § 202.3(b)(4)(A).

As Defendants contend, *Kay Berry*, indeed, concludes that Section 408(c) of the Copyright

Act does not grant copyright applicants the general right to register a *group* of related works under

a single registration. *Kay Berry*, 421 F.3d at 204. Rather, "the plain language of § 408(c)(1)

merely allows the Register of Copyrights to determine what types of works are eligible for group

registration" through the promulgation of regulations authorizing particular classes of related

works to be eligible for *group* registration. *Id.* And, the Register of Copyrights has promulgated

regulations allowing group registration for automated databases, related serials, daily newspapers,

contributions to periodicals, daily newsletters, and published photographs. *See* 37 C.F.R. §

202.3(b)(6)-(10). The problem, however, is that collection registrations under 37 C.F.R. §

202.3(b)(4)(A) are *not* group registrations. Rather, they are, and have been for the last thirty-two

years, considered *single work* registrations for the collections they encompass.

Thus, a "'[s]ingle Work' registration is separate and distinct from [a] 'Group

Registration'". *Kay Berry*, 421 F.3d at 205. The regulation covering *single work* registrations (37

C.F.R. § 202.3(b)(4)(A)), promulgated by the Register of Copyrights pursuant to 17 U.S.C. §

408(a), "codified the pre-existing Copyright Office practice of allowing copyright owners to

register multiple works published together as a single work for a single fee." *Id.* (citing

Registration of Claims to Copyright, 43 Fed. Reg. 965, 966 (Jan. 5, 1978)). Specifically, the

*single work* registration regulation describes a *single work*, "[i]n the case of published works", as

"all copyrightable elements that are otherwise recognizable as self-contained works, that are

included in a single unit of publication, and in which the copyright claimant is the same." 37

C.F.R. § 202.3(b)(4)(A) (originally promulgated as 37 C.F.R. § 202.3(b)(3)(i)(A)). A *single work*

registration for a collection of published works, therefore, requires only that "all of the self-

contained works be 'included in a single unit of publication' and share the same copyright

claimant." *Kay Berry*, 421 F.3d at 205 (citing 37 C.F.R. § 202.3(b)(4)(A)).

Here, all of the self-contained works included in Yurman's, Gucci's and Bulgari's

respective collections of unique and innovative jewelry designs were published in a single unit of

publication — promotional catalogs — and share the same copyright claimant. Indeed, Yurman

and Gucci have received correspondence from the Copyright Office that confirms this:

> Copyright Office regulations state at 37 C.F.R. §202.3 that, for any published
> work, registration extends to "all copyrightable elements that are otherwise
> recognizable as self-contained works, that are included in a single unit of
> publication, and in which the copyright claimant is the same." . . . These are
> collections of individual works which were apparently published as single units.

Ederer Decl. ¶ 5, Ex. D. This language tracks the *single work* regulation, making clear that the

subject collection registrations are not, and have never been considered to be *group* registrations,

but rather *single work* registrations, as anticipated in *Kay Berry*.

Accordingly, the Court should deny Defendants' motion for summary judgment on this

point. Plaintiffs' collection registrations are valid, as the Copyright Act affords a "certificate of a

registration made before or within five years after first publication of the work" a presumption of

validity. 17 U.S.C. § 410(c); *see also Rogers v. Koons*, 960 F.2d 301, 306 (2d Cir. 1992).

Further, since there is no genuine issue of material fact that Defendants' knockoffs infringe the

jewelry designs covered by Plaintiffs' collection registrations, the Court should award summary

judgment and statutory damages to Plaintiffs.

**B.    Cartier and Van Cleef & Arpels Have Standing to Assert Infringement Claims
Based On French Copyrights**

Defendants' next bogus argument is that Cartier and Van Cleef & Arpels lack standing to

maintain their copyright infringement claims based on French copyrights because, as a matter of

law, they do not own the copyrights in the jewelry and watch designs at issue under French law.

Specifically, Defendants argue that because the French Intellectual Property Code (the "FIPC"), unlike the U.S. Copyright Act, does not recognize the concept of work-for-hire[1], absent evidence of assignment or transfer between Cartier and Van Cleef & Arpels and the designers who created the designs, it is presumed that the owners of the designs at issue are the designers themselves.

Cartier and Van Cleef & Arpels do not dispute that under *Itar-Tass Russian News Agency v. Argumenty I Fakty*, 153 F.3d 82, 90 (2d Cir. 1998), French law governs the issue of ownership. However, they do dispute Defendants' analysis of the ownership issue under French law. Contrary to Defendants' assertion, under the FIPC, the Cartier French copyrighted designs are "the property, unless proved otherwise" of Cartier, because they were all designed collectively by members of Cartier's internal design team, and, as such, are considered collective works ("*oeuvre collective*") owned by Cartier. FIPC Article L. 113-5. Dube Decl. ¶ 3, Ex. A.

It is, admittedly, a fundamental principle under French intellectual property law that "copyright ownership belongs to the author of a work, regardless of a possible contract for hire or of service." Jean-Luc Piotraut, *An Author's Right-Based Copyright Law: The Fairness and Morality of French and American Law Compared*, 24 Cardozo Arts & Ent. L.J. 549, 577 (2006). However, as Defendants concede in their moving papers, there are a number of exceptions to this principle, and "[u]nder these exceptions, initial ownership is conferred to employers or commissioning parties, despite the fact that they might be legal entities rather [than] natural persons." Piotraut, 24 Cardozo Arts & Ent. L.J. at 577.

Particularly relevant here, is the exception for *collective works* ("*oeuvre collective*"). The FIPC defines a *collective work* as:

---

[1] Under the U.S. Copyright Act, "the employer or other person for whom the work was prepared is considered the author . . . and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." 17 U.S.C. § 201(b).

> a work created at the initiative of a natural or legal person who edits it,
> publishes it and discloses it under his name and in which the personal
> contributions of the various authors who participated in its production are
> merged in the overall work for which they were conceived, without it being
> possible to attribute to each author a separate right in the work as created.

FIPC Article L.113-2(2).  Significantly, pursuant to FIPC Article L. 113-5, "[a] collective work shall be the property, unless proved otherwise, of the natural or *legal person* under whose name it has been disclosed.  The author's rights shall vest in such person." (Emphasis added).  Accordingly, the FIPC's general presumption of employee ownership is reversed for *collective works* — here, it is presumed that the owner of the copyrightable work is the *legal person (i.e.,* Cartier) under whose name the work has been published.  Furthermore, French courts have found collective works to include, among other things, jewelry.  *See* Dube Decl. ¶ 3, Ex. A.

Here, Defendants acknowledge that the Cartier French copyrighted designs at issue were created by "design teams" in Cartier's design studio in Paris, France.  Defs' Br. at 13.  Moreover, the evidence of record establishes that the design and creation process employed by Cartier is entirely consistent with the concept of *collective works*.  Dube Decl. ¶¶ 3,4, Ex. A; Ederer Decl. ¶ 4, Ex. C at 14:20-17:2 (C. LaCaze).  In light of the indivisible contributions made by each member of the Cartier design team — not to mention the modifications and refinements suggested by marketing staff, model makers, and upper management — no one individual can claim ownership of the final piece of jewelry.  This is precisely why the FIPC recognizes the concept of *collective works*, and authorizes legal entities to be the owners of such works.  *See* Dube Decl. ¶ 3, Ex. A.

Furthermore, all designers employed by Cartier are required to enter into written employment contracts that expressly state that the designs they contribute to are *collective works* that are the property of Cartier.  In addition, the employment agreements of all Cartier designers contain a clause that requires them, if necessary, to assign any and all rights they may be deemed to have in any designs they contributed to while employed to Cartier.  Dube Decl. ¶ 4, Exs. B, C.

As for the single Van Cleef & Arpels French copyright design at issue, this work was designed by an external contractor who assigned her rights, including copyright, in this work to Van Cleef & Arpels. *See* Gilbert-Zinck Decl. ¶¶ 5-6, Ex. A.

Thus, as a matter of law, Cartier and Van Cleef & Arpels own the French copyrighted works at issue, and, therefore, have standing to assert claims for infringement of such works. The Court should deny Defendants' motion for summary judgment with respect to these claims.

### C.    Bulgari's Copyright Registrations Cover the Jewelry Designs At Issue

Defendants argue that the Court lacks jurisdiction over Bulgari's copyright claims because Bulgari's U.S. copyright registrations cover only catalogs depicting its jewelry collections, not the jewelry items depicted in the catalogs. In particular, Defendants point to the fact that Bulgari, when it filed these Form VA applications (for works of visual arts), indicated that the "Nature of the Work" was "catalogs" and the "Nature of Authorship" was "photographs" and 'text". Defendants' argument is premised on an overly simplistic view of copyright law.

First, contrary to Defendants' argument, the Register of Copyrights does not view an applicant's classifications of the "Nature of the Work" and "Nature of Authorship" as determinative of the scope of the copyright. Rather, while the Register of Copyrights is authorized to specify the administrative classes into which works are to be placed for purposes of deposit and registration, "this administrative classification of works has no significance with respect to the subject matter of copyright or the exclusive rights provided by this title." 17 U.S.C. § 408(c)(1); *see also Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 539 (4th Cir. 2007) ("[t]he scope of registration need not precisely trace the scope of the copyright for the holder to sue"). Here, Bulgari applied on Form VA to register works of visual arts. Catalogs are *not* works of visual arts, but rather are registered under Form TX, as non-dramatic literary works. So, the fact that Bulgari indicated on its Form VA applications that the "Nature of the Work" was a

catalog does not transform the registrations into anything other than what they were intended to be, registrations for works of visual art.

Second, as discussed above, Bulgari, like Yurman and Gucci, generally registers its jewelry design copyrights as "collections," rather than filing separate applications for each individual jewelry design. As part of these applications, Bulgari submits, as supporting deposit material, the particular collection catalog for the designs it seeks to register. It has never been Bulgari's intention, however, to register U.S. copyrights in the catalogs as catalogs. Rather, the purpose of submitting the catalogs is to provide a single unit of deposit reflecting all the individual jewelry designs Bulgari seeks to protect under its "collection" applications, and to protect each and every individual design within that deposit.[2]  See Fioruzzi Decl. ¶¶ 4-10.

Third, Bulgari's registrations have previously been recognized by U.S. Customs for exactly what they are, collection registrations that protect the jewelry designs appearing in the catalogs. In 1993, Bulgari specifically inquired of U.S. Customs as to whether it would, on the basis of a "collection" registration recorded with U.S. Customs (supported by catalogs as deposit materials), seize counterfeits and infringements of the individual articles depicted in the catalogs. In response, U.S. Customs provided Bulgari with a previously issued Headquarters Ruling Letter stating that, under U.S. copyright law, catalog registrations extend protection to the individual jewelry designs depicted in the catalogs. Specifically, U.S. Customs stated:

> Often . . . when a single statutory "author" applies for copyright protection for several like works, (e.g., a group of songs, poems, or drawings), the author will assemble representations of those works into a volume or "catalogue," rather than applying for several individual registration certificates. In that situation, the *copyright protects not only the arrangement of the works reproduced in the catalogue but the works themselves.*

_____

[2] Notably, Bulgari has also registered each of the designs at issue with the Italian Copyright Office, through the submission of the same collection catalogs. *See* Fioruzzi Decl. ¶ 11.

Fioruzzi Decl. ¶ 8, Ex. A (emphasis added).  In fact, U.S. Customs has since seized counterfeits

and infringements of Bulgari's copyrighted jewelry designs on the basis of several of Bulgari's

collection registrations (supported, again, by catalogs as deposit materials).  *See* Fioruzzi Decl. ¶

9.  This is, indeed, consistent with the case law recognizing that registrations of works that contain

separately registrable material within them also serve to protect the underlying material.  *See E.*

*Am. Trio Prods. v. Tang Elec.*, 97 F. Supp. 2d 395, 417 (S.D.N.Y. 2000); *Greenwich Film Prods.,*

*S.A. v. DRG Records, Inc.*, 833 F. Supp. 248 (S.D.N.Y. 1993).

Thus, as obviously intended, Bulgari's collection registrations cover the jewelry designs at

issue as a matter of law, and this Court has jurisdiction over Bulgari's copyright claims.[3]

## II.  THERE ARE GENUINE ISSUES OF MATERIAL FACT THAT PRECLUDE SUMMARY JUDGMENT ON THE REMAINDER OF PLAINTIFFS' CLAIMS

Defendants seek summary judgment dismissing Plaintiffs' claims for trademark

infringement, false designation of origin, trademark dilution, common law unfair competition,

trade dress infringement[4], and New York State unfair competition and dilution under New York

General Business Law § 360-l, all on the grounds that (1) Overstock's pervasive use of Plaintiffs'

word marks constitutes a permissible "nominative fair use", and (2) Overstock's pervasive use of

---

[3] Further, for the avoidance of doubt, Bulgari has recently filed supplemental applications for the registrations in question, to make crystal clear its intention that these registrations were intended to cover the jewelry designs depicted in the catalogs.  *See* Ederer Decl. ¶ 12.

[4] The Court should deny Defendants' motion for summary judgment as to Yurman's and Van Cleef & Arpels' claims for trade dress infringement, and Van Cleef & Arpels' and Gucci's claims for false designation of origin relating to their respective Alhambra and Horsebit designs.  First, Defendants' nominative fair use argument is not applicable to these claims.  Defendants are not using Yurman's and Van Cleef & Arpels' trade dress or Van Cleef & Arpels' (Alhambra) and Gucci's (Horsebit) famous *design* marks to describe Plaintiffs' *own* products.  Rather, they are admittedly copying these designs and incorporating these source-identifying design elements into their own infringing products.  Second, Defendants do not even discuss these claims in the likelihood of confusion section of their brief.  Thus, the Court should not entertain Defendants' motion for summary judgment with respect to these claims.  However, should the Court do so, these claims present classic issues of fact: have Plaintiffs established secondary meaning in their designs, and are Defendants' knockoffs likely to cause consumers, either at the point of sale, or post-sale, to be confused and believe that Plaintiffs are the source of Defendants' products?

Plaintiffs' word marks and admitted knockoffs of Plaintiffs' design marks and trade dress do not

create a likelihood of confusion, because Defendants' retail prices are lower than Plaintiffs', and

therefore a purchaser would never think she is buying the "real thing" (even though it is suggested

many times in Defendants' promotional copy that she is).  As both of Defendants' grounds for

summary judgment raise numerous disputed issues of fact, summary judgment must be denied.

**A.    Whether Defendants' Pervasive Use of Plaintiffs Trademarks Constitutes a Nominative Fair Use Is An Issue of Fact to be Resolved By the Jury**

Defendants contend that the Court should award summary judgment dismissing Plaintiffs'

trademark claims because, as a matter of law, Overstock's pervasive use of Plaintiffs' famous

brand name trademarks throughout their website constitutes a permissible nominative fair use.[5]

Essentially, Defendants argue that because, in certain (but not nearly all) instances, their reference

to Plaintiffs' famous brand names is accompanied by the words "inspired" or "-esque", no

consumers could ever be confused as to the source of such goods.  The nominative fair use

defense, which evolved from the Ninth Circuit's holding in *New Kids on the Block v. News Am.*

*Publ'g, Inc.*, 971 F.2d 302 (9th Cir. 1992), is established upon a showing of three elements (1)

"the product or service in question must be one not readily identifiable without use of the

trademark", (2) "only so much of the mark or marks may be used as is reasonably necessary to

identify the product or service", and (3) "the user must do nothing that would, in conjunction with

the mark, suggest sponsorship or endorsement by the trademark holder".  *New Kids*, 971 F.2d at

---

[5] Contrary to Defendants' contention, once again the nominative fair use defense is not available to defeat Cartier's and Gucci's claims for counterfeiting of registered *design* marks. The nominative fair use defense is only available when a defendant uses a party's trademark (typically its brand name) to refer to the party's *own* product.  Here, Defendants are marketing and selling products that incorporate designs that are substantially indistinguishable from (*i.e.*, counterfeits of) Plaintiffs' registered designs.  There is no authority suggesting that a counterfeit of a registered design mark can be deemed "nominative" and thus protected.  Thus, the Court should deny Defendants summary judgment on these claims, and grant Cartier and Gucci summary judgment and award them the maximum amount of statutory damages in light of Defendants' willful counterfeiting.

308; *Chambers v. Time Warner*, 282 F.3d 147, 156 (2d Cir. 2002) (adopting *New Kids*).

Defendants cannot satisfy any of these three prerequisites, and in particular the third. Defendants'

pervasive use of Plaintiffs' world famous trademarks on the Overstock website in conjunction

with the promotion and sale of jewelry and watch products — many of which are admitted slavish

copies of Plaintiffs' registered and otherwise protected designs — clearly can be seen to suggest or

imply Plaintiffs' sponsorship or endorsement of Defendants' products. At the very least, the issue

of whether consumers believe, when they log onto Defendants' website, that Defendants are

authorized or sponsored by Plaintiffs to sell their "overstocks", at discounts off of "list prices" that

are often comparable to Plaintiffs' own retail prices, involves the determination of factual issues

that are not suitable for decision on summary judgment. *See S&L Vitamins, Inc. v. Australian*

*Gold, Inc.*, 521 F. Supp. 2d 188, 207 (E.D.N.Y. 2007) ("there are genuine issues of material fact as

to whether [defendant] has engaged in practices that suggest [plaintiff's] endorsement or

sponsorship of the sale of the Products on the Websites").

    In applying the *New Kids* three-prong nominative fair use test, Courts in this Circuit have

consistently held that "use of [a trademark] is only nominative if 'it does not imply sponsorship or

endorsement by the trademark holder.' In other words, a use is *not* nominative if it creates a

likelihood of confusion about the mark-holder's affiliation or sponsorship." *Chambers v. Time*

*Warner*, 2003 WL 749422, at *3 (S.D.N.Y. Mar. 5, 2003) (emphasis added); *see also Merck &*

*Co., Inc. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 414 (S.D.N.Y. 2006) ("the

third element of the nominative fair use defense requires that the use of the trademark not create a

likelihood of confusion as to the mark-holder's sponsorship, endorsement, or affiliation").

    Defendants' principal argument on this motion, that "[a] defendant's good faith, not the

likelihood of confusion, is the touchstone of the [nominative fair use] inquiry . . . because the

objective of the [third] prong is to determine whether the *defendant has done anything* to suggest

sponsorship or endorsement by the plaintiff, not to determine whether *there is* a suggestion of

sponsorship or endorsement", is truly bizarre. Defs' Br. at 20. Aside from the fact that their

intention is quite clear, what Defendants appear to be saying is that it is perfectly acceptable for

consumers to think that the Overstock website is sponsored or approved by Plaintiffs, as long as

Defendants did not *intend* to make them think that. Based on this unprecedented interpretation of

the law of nominative fair use, Defendants contend that the third prong of the *New Kids* test, as

adopted by *Chambers* — "the user must do nothing that would, in conjunction with the mark,

suggest sponsorship or endorsement by the trademark holder" — amounts to "merely an

assessment of the 'intent' *Polaroid* factor." *Id.* at 22.

  Not satisfied with turning *New Kids* and trademark jurisprudence on their head, Defendants

aggravate matters by conflating the distinct concepts of "classic fair use" and nominative fair use.

Unlike nominative fair use, the classic fair use defense is applicable where the defendant has used a

party's descriptive mark, in its descriptive sense, to describe the *defendant's* own product. *New*

*Kids*, 971 F.2d at 308. To establish a classic fair use, a defendant must establish that it has made

use of a party's mark (1) other than as a trademark, (2) in a descriptive sense, and (3) in good faith.

*EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos, Inc.*, 228 F.3d 56, 64 (2d Cir.

2005).[6] Defendants are, either deliberately or because they do not know the law, inappropriately

seeking to substitute the "good faith" prong of the classic fair use defense for the third prong of the

---

[6] Defendants inaccurately state that this Court's decision in *New York Mercantile Exch., Inc. v.
Intercontinentalexchange, Inc.*, 389 F. Supp. 2d 527, 545 (S.D.N.Y. 2005) stands for the
proposition "that nominative fair use can occur *even if* a defendant's use of the plaintiff's
trademark creates a likelihood of confusion." Defs' Br. at 18. This is not correct. The Court in
*N.Y. Mercantile* was commenting on "classic fair use", and not nominative fair use. *N.Y.
Mercantile*, 389 F. Supp. 2d at 545 (citing *Cosmetically Sealed Indust., Inc. v. Chesebrough-
Pond's USA Co.*, 125 F.3d 28, 30 (2d Cir. 1997)). As explained above, these distinct concepts are
not interchangeable, and Defendants reliance on authority discussing "classic fair use" is entirely
misleading and should be disregarded.

*New Kids* nominative fair use test, which implicates a full blown confusion analysis. Defendants have failed to cite a single authority or articulate one reason why this Court should break from the clear precedent of *Chambers*, *Merck & Co.*, and *S&L Vitamins*. As required in those cases, this Court must apply a full likelihood of confusion analysis in weighing the third prong of the *New Kids* nominative fair use test.

As shown below, a likelihood of confusion analysis would require the resolution of numerous issues of material fact as to whether consumers think that Defendants' website, or sale of Plaintiffs' "overstock" products, is sponsored or approved by Plaintiffs. These issues cannot be determined on summary judgment. *The Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 960 (2d Cir. 1996) (summary judgment based on likelihood of confusion is not appropriate unless the undisputed evidence may lead to only one conclusion). Indeed, each factor in a likelihood of confusion analysis itself presents a factual issue susceptible to genuine dispute.

Further, as discussed below, even if the analysis here were limited, as Defendants incorrectly argue, to an examination of Defendants' good faith, that issue, at the very worst, presents an issue of fact, and at best, is an issue that can be decided against Defendants on summary judgment based on an examination of the Overstock website and Castaneda's deposition testimony. Thus, even if Defendants' tortured interpretation of nominative fair use were correct, summary judgment would still be inappropriate.

## B.    Whether There is a Likelihood of Confusion is a Fact-Intensive Analysis that Cannot be Determined on Summary Judgment

Even beyond their misguided discussion of nominative fair use, Defendants further contend that they are, in any event, entitled to summary judgment dismissing Plaintiffs' claims for willful trademark infringement, false designation of origin, New York dilution, common law and New York unfair competition, and trade dress infringement, because Plaintiffs have failed to make

14

a threshold showing of likelihood of confusion. Defendants' principal argument here is that because their products retail for lower prices than Plaintiffs', no one would ever think they are buying Plaintiffs' genuine products. This argument, of course, ignores the multitude of reasons why an unsuspecting consumer might think she is indeed buying Plaintiffs' genuine products — not the least of which is the pervasive use of Plaintiffs' famous brand names; the website's name (Overstock Jeweler), which connotes the sale of genuine products at a discount; and "list prices" which are three to four times higher than Defendants' actual retail price, since Defendants admit that these "list prices" are made up and are published nowhere, exactly whose "list prices" are Defendants referring to?

In determining likelihood of confusion, a Court must consider numerous factual issues, rendering an award of summary judgment difficult in cases where confusion is disputed. *See Sports Auth.*, 89 F.3d at 960. Here, in determining whether there is a likelihood of confusion, the Court must assess "whether the use of Plaintiffs' marks *within the context of the Defendant's website* is likely to confuse customers" as to Plaintiffs' sponsorship or endorsement of Defendants' products. Defs' Br. at 22. Generally, courts in this Circuit carry out this inquiry by considering the eight fact-intensive factors articulated in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961). While these factors serve as a useful guide, there is no "rigid formula" for determining a likelihood of confusion. *Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872 (2d Cir. 1986). As discussed below, each of the relevant *Polaroid* factors either tip decidedly in favor of a finding of a likelihood of confusion here, or at least raise genuine issues of material fact that cannot be resolved on summary judgment.

Before turning to the individual *Polaroid* factors, this Court must consider the overall context in which Defendants deploy Plaintiffs' trademarks. *First*, the word "overstock", as used in Defendants' trade name, is clearly intended to be, and is understood by consumers to mean that

15

Defendants sell "overstocks" of authentic brand name goods.[7]  This obvious intention is reinforced by Overstock's "About Us" webpage, which describes Castaneda's "20 years of experience of buying overstock production" for her family's specialty discount store as the basis for her decision "to focus on her favorite thing to purchase, jewelry and taking here [sic] Overstock buying expertise's [sic]" in creating Overstock.  Ederer Decl. ¶ 8(i), Ex. G.  At her deposition, realizing that she had been trapped, Castaneda lied and testified that she intended for consumers to understand that the word "overstock", as used in her company's trade name, meant the excess stock of her knockoff suppliers, *not* the "overstock" of Yurman, Cartier, Van Cleef & Arpels, Bulgari and Gucci.  *Id.* at ¶ 2, Ex. A at 125:1-126:5.  While false on its face, at the very least this presents a genuine issue of material fact for a jury to decide — what does the word "overstock" mean to consumers when used in this context?

*Second*, in furtherance of their scheme to cause consumers to believe that they are selling authentic brand name "overstocks" at discount prices, Defendants post phony, artificially inflated "list prices" for each of their knockoff products.[8]  Defendants' "list prices" are generally three to four times the sale price.  At her deposition, Castaneda admitted that these prices are not "listed" or posted anywhere, but rather were based on an "industry standard" markup.  She further testified that all consumers would understand this, and not that Overstock was referring to the "list prices" of Plaintiffs' genuine products before they became "overstocks".  *Id.* ¶ 2, Ex. A at 179:17-180:25.  Further, although Defendants contend that everyone understands that Overstock only sells "costume" jewelry, the "list prices" for many of Defendants' products are comparable to, or

---

[7] Indeed, the well known website, Overstock.com, is based on a similar business model of selling leading brand name products at significant discounts.  *See* www.overstock.com.

[8] On the eve of bringing this motion, Defendants informed Plaintiffs that they have stopped using "list pricing" on their website.

exceed, the prices of Plaintiffs' counterpart genuine products. For example, Defendants' "list price" for one of the Cartier knockoffs at issue is a whopping $3,499.99. *Id.* at ¶ 6(i), Ex. E. In any event, the issue of whether Defendants' fictitious "list pricing" has contributed to a likelihood of confusion presents a issue of fact that cannot be decided on summary judgment.

*Third*, Defendants' own product descriptions repeatedly and pervasively use Plaintiffs' trademarks. While sometimes Plaintiffs' marks are used to trumpet the fact that Defendants' products are knockoffs — "[t]his pendant is a *replica* of the famous David Yurman Albion design" (*id.* at ¶ 8(iii), Ex. G); "[t]his Cartier-esque Inspired Pasha Collection pendant . . . is *strikingly similar* to the thing" (*id.* at ¶ 8(iv), Ex. G); "this Gucci Jewelry Collection *replica* bracelet" (*id.* at ¶ 8(v), Ex. G), sometimes they are used on a standalone basis. Ederer Decl. ¶ 11. Defendants' pervasive use of Plaintiffs' marks alone is sufficient to cause an issue of fact as to confusion.[9]

Defendants also repeatedly promote the fact that their products offer the same cachet as Plaintiffs' famous genuine jewelry and watch designs. For instance, Defendants' product descriptions often include phrases such as "[y]ou'll feel like the *real thing* in this Cartier replica bracelet". *Id.* at ¶ 6(i), Ex. E. In doing so, Defendants are telling their customers that even if *they* realize they are not purchasing genuine products, their *friends and passersby* will not be able to tell the difference. This is classic post-sale confusion, and as the Second Circuit explained in *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, post-sale confusion is as actionable under the

---

[9] *See, e.g., Cartier, Inc. v. Deziner Wholesale LLC*, 55 U.S.P.Q.2d 1131 (S.D.N.Y. 2000) (defendant's repeated references to plaintiff's trademark was likely to cause confusion as to the products origin, sponsorship or endorsement); *Invicta Plastics Ltd. v. Mego Corp.*, 523 F. Supp. 619 (S.D.N.Y. 1981) (an inference of likelihood of confusion was drawn from infringer's deliberate attempt to associate its product with plaintiff's successful product); *Horphag Research Ltd. v. Pellegrini*, 328 F.3d 1108, *rev'd on other grounds*, 337 F.3d 1036 (9th Cir. 2003) (enjoining defendant's "unreasonably pervasive" references to plaintiff's mark on its website).

Lanham Act as point-of-sale confusion.  219 F.3d 104, 108 (2d Cir. 2000) ("post-sale confusion can occur when a manufacturer of knockoff goods offers consumers a cheap knockoff copy of the manufacturer's more expensive product, thus allowing the buyer to acquire the prestige of owning what appears to be the more expensive product").  As Defendants' own website outwardly promotes post-sale confusion as a reason for consumers to purchase their products, this too, at the very least, presents issues of material fact as to sponsorship and endorsement that cannot be decided on summary judgment.

Defendants' argument that no consumers are likely to be confused because Defendants' products are much cheaper than Plaintiffs' products also implicates factual issues concerning the sophistication of the consumers and the proximity of the products, that cannot be decided on summary judgment.[10]  Further, Defendants ignore other key *Polaroid* factors that also present issues of fact.  First, Defendants argue that the Court should disregard the two most important *Polaroid* factors — the strength of Plaintiffs' marks and the similarity between Plaintiffs' and Defendants' marks.  Defendants concede that Plaintiffs' marks are strong, and that their use is identical, but fall back on their nominative fair use defense.  Incredibly, Defendants then proceed to discuss the rest of the *Polaroid* factors, ignoring these two.  Obviously, these two factors overwhelming favor Plaintiffs; indeed, if Plaintiffs' marks were not as famous as they are, Defendants would not be plastering them all over their website.

Ignoring the ways in which they use Plaintiffs' brand names and designs to promote their own products, Defendants contend that, as a matter of law, the proximity of the products factor

---

[10] The eight *Polaroid* factors are:  (1) the strength of the plaintiff's mark; (2) the similarity of the parties' marks; (3) the proximity of the parties' products in the marketplace; (4) the likelihood that the plaintiff will "bridge the gap" between the products; (5) actual consumer confusion between the two marks; (6) the defendant's bad faith; (7) the quality of defendant's product; and (8) the sophistication of the relevant consumer group. *Polaroid*, 287 F.2d at 495.

supports a finding of no likelihood of confusion. In support of this position, Defendants allege that (1) Defendants sell "inexpensive costume jewelry" through a "completely separate and distinct market" than Plaintiffs, and (2) there is "a sizable price difference between Plaintiffs' and Defendants' products". Defs' Br. at 24. However, these too present issues of material fact that preclude a determination on summary judgment.

In support of their contention that the products are not proximate, Defendants assert that the "price range for [their] costume jewelry is from $29.99 through $179.99 at the top end" and that "none of it[s products] contain[] diamonds". However, once again these statements are false. *First*, numerous jewelry products being offered for sale on Defendants' website drastically exceed the "top end" $179.99 retail price — *e.g.*, "Cartier-esque Inspired 14K Gold Screw Motif Bangle Bracelet" ($1,499.99) (Ederer Decl. ¶ 6(i), Ex. E); "David Yurman-Esque 18K Gold Circle Clasp Double Cable Bangle" ($999.99) (*id.* ¶ 6(ii), Ex. E); "Inspired by Bulgari Diamond and 14K Gold Half Double-Hoop Earrings" ($379.99) (*id.* ¶ 6(vii), Ex. E); "Gucci Inspired Sterling Silver 20" Square Link Men's Chain Necklace" ($299.99) (*id.* ¶ 6(xii), Ex. E). *Second*, Defendants ignore the fact that their website's home page contains a hyperlink labeled "Diamond Jewelry", which when visited, promotes Defendants' sale of "Designer inspired genuine diamond rings, earrings & pendants all set in 14 karat gold or yellow gold." Among these pieces are multiple knockoffs of Yurman, Cartier and Bulgari. *Id.* at ¶ 6(vi), (viii), (vii), Ex. E.

Further, as Castaneda is clearly an expert in this area, it has not likely escaped her that Plaintiffs also sell many authentic jewelry products at lower prices that are comparable to Defendants' — Yurman starting at $250; Van Cleef & Arpels starting at $600; Gucci starting at

$390; and Bulgari starting at $900 — via their own websites.[11]  Defs' 56.1 Statement ¶¶ 21, 23, 38, 41, 44, 52; Ederer Decl. ¶ 7, Ex. F.  Thus, there are, at least, genuine issues of material fact regarding the proximity of the parties' products, and what consumers understand about Defendants' pricing practices when they visit Defendants' website.  Accordingly, this factor cannot be determined on summary judgment.

As for the "sophistication of the consumer" factor, relying once again on the same set of facts, Defendants contend that, as a matter of law, consumers are sophisticated enough to realize that Overstock's $1,499.99 Cartier knockoff bracelet and $999.99 Yurman knockoff bangle are not genuine "overstocks" of Plaintiffs' goods.  Clearly, this too is an issue that cannot be determined on summary judgment.

As for the "actual confusion" factor, Defendants contend that the Court cannot find a likelihood of confusion because Plaintiffs have proffered no evidence of actual confusion.[12]  Defendants are quick to point out that not one Yahoo! customer review reveals any instance of actual confusion.  Defendants, however, fail to mention that Overstock's proprietor, Castaneda, admitted to destroying — after these litigations were commenced — the very product return forms that would reflect instances of actual confusion.  Ederer Decl. ¶ 2, Ex. A at 234:5-18.  Accordingly, Defendants have absolutely no basis for arguing that there has been no actual confusion.  Indeed, should this case proceed to trial, given the spoliation of evidence, Defendants should be precluded from introducing any testimony to the contrary.

As for the "bad faith" factor, Defendants contend that their website's "Disclaimer"

---

[11] Cartier and Van Cleef & Arpels maintain promotional websites that feature their products, but do not offer their products for sale through such websites.

[12] "It is black letter law that actual confusion need not be shown to prevail under the Lanham Act." *Savin Corp. v. Savin Group*, 391 F.3d 439, 459 (2d Cir. 2004).

"unequivocally demonstrates that Defendants did not intend to trade on Plaintiffs' good will, and establishes Defendants' good faith." Defs' Br. at 25. However, hiding behind a disclaimer consumers may never see, while committing multiple bad faith acts designed to purposefully deceive consumers, does not unequivocally demonstrate anything about Defendants' good faith.

Defendants' "Disclaimer" page states, in part, that "[b]ecause we respect the intellectual property rights of third parties, . . . Overstockjeweler will promptly and permanently remove any item from sale that infringes the intellectual property rights of a third party." Zarin Decl. Ex. E. However, when asked at their depositions whether Overstock inquires of its suppliers whether any of the products they buy infringe the intellectual property rights of famous designers, both Castaneda and Overstock's buyer, Alice Limantara, testified that Defendants make no such inquiry. Ederer Decl. ¶ 2, Ex. A at 221:24-222:13; ¶ 3, Ex. B at 63:9-19. Indeed, Castaneda proudly proclaimed that "I don't make [the products], so I don't have to do that." Zarin Decl. Ex. A at 174:2-17. Then, even after the filing of these actions, Defendants continued to sell all of the complained-of products, and only now, in anticipation of this motion, have taken a handful of the infringing items down. In addition, Defendants have utterly failed to meet their burden of demonstrating that Overstock's "disclaimer" is effective in mitigating confusion. *E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc.*, 90 F. Supp. 2d 277, 297 (S.D.N.Y. 2000) ("one seeking to avoid a finding of likely confusion on the basis of a disclaimer bears the burden of demonstrating that the disclaimer was or is likely to be effective"). Thus, the bad faith factor tips decidedly in favor of Plaintiffs.

Overall, at worst a *Polaroid* analysis presents issues of material fact as to confusion. Defendants' motion for summary judgment as to likelihood of confusion should be denied.

### C.   Defendants Are Not Entitled to Summary Judgment on Plaintiffs' Federal Trademark Dilution Claims

Defendants assert that Plaintiffs' federal trademark dilution claims should be dismissed because Plaintiffs have not made a showing of actual dilution. Defs' Br. at 27. Defendants' argument, based on outdated law, is unpersuasive. Pursuant to the Trademark Dilution Revision Act of 2006, PUB. L. 109-312, 120 Stat. 1730 (codified in relevant part at 15 U.S.C. § 1125(c)(1)), Plaintiffs need only establish a "likelihood of dilution" rather than "actual dilution." *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 81 U.S.P.Q.2d 1064 (E.D. Va. 2006) (explaining that the 2006 amendment to Section 1125(c) replaces the "actual dilution" requirement with a "likely dilution" requirement). Thus, the alleged absence of evidence of actual dilution is of no moment.

**D.    Defendants Have Willfully Infringed Plaintiffs' Copyrights and Trademarks**

Defendants contend that if Plaintiffs prevail on their copyright and trademark infringement claims, they should not be awarded enhanced statutory damages or reasonable attorneys' fees because Defendants have not act willfully. Once again, Defendants argue that their open, pervasive and deliberate use of Plaintiffs' intellectual property is absolved by their "disclaimer" (which they now claim, for the first time, was posted upon the advice of counsel), and the fact that they purportedly ceased selling a handful of items that infringed Yurman's copyrights in 2005. This in no way justifies or excuses Defendants' ongoing willful infringement of Plaintiffs' intellectual property.

As explained above, Defendants do absolutely nothing to determine whether the products they are buying, and which they openly promote as knockoffs of Plaintiffs' products, infringe Plaintiffs' intellectual property rights. Instead, they attempt to hide behind a "disclaimer" page which sets forth a policy for dealing with the intellectual property rights of others that Defendants do not follow. Further, Castaneda's cavalier attitude toward Plaintiffs' intellectual property rights — "I don't make [the products], so I don't have to [look into whether the goods I sell infringe

22

Plaintiffs' intellectual property rights]" (Zarin Decl. Ex. A at 174:2-17) — speaks volumes. *Lorillard Tobacco Co., Inc. v. A&E Oil, Inc.*, 503 F.3d 588, 592 (7th Cir. 2007) (failure to investigate because one "was afraid of what the inquiry would yield" is sufficient to establish willful infringement). Defendants' willfulness is further evidenced by the fact that after these actions were filed, Defendants continued to sell all of the complained-of products.

Defendants also rely on a newly-asserted advice-of-counsel defense to rebut the overwhelming evidence of willful infringement. Defendants first informed Plaintiffs that they would be relying on an advice-of-counsel defense by letter sent after business hours on June 6, 2008 (four business days prior to filing their instant motion), months after discovery closed, and after Defendants had objected to and refused to answer an interrogatory specifically inquiring whether they intended to rely on an advice-of-counsel defense.[13] Ederer Decl. ¶ 10, Ex. I. Plaintiffs have had no discovery as to either the scope of the advice purportedly given to Defendants, or the reasonableness of Defendants' reliance thereon. Thus, unless the Court rejects Defendants' advice-of-counsel defense out of hand, Plaintiffs must be given the opportunity to take discovery of Defendants and their former counsel. In either event, summary judgment in favor of Defendants on this issue would be entirely improper.

### E.    Plaintiffs Have Standing to Assert False Advertising Claims

Defendants allege that Plaintiffs lack standing to assert claims for false advertising under 15 U.S.C. § 1125(a) because Plaintiffs and Defendants compete in "two distinct markets". Defs' Br. at 30. At the same time, Defendants contend that Plaintiffs' marks are being used for "comparative advertising". *Id.* at 19. Defendants cannot have it both ways. Comparative

---

[13] Plaintiffs also had no idea that Defendants would also be relying on an advice-of-counsel defense with respect to their copyright infringement claims prior to receiving Defendants' motion papers.

advertising necessarily entails that the products are in competition with one another. *McCarthy on Trademarks* § 27:59 (comparative advertising is often the basis of false advertising claims).

Moreover, as discussed above, Defendants' contention that the parties compete in separate markets due to a "sizeable price difference" between their products (Defs' Br. at 24) is contradicted by the fact that certain of their so-called "inexpensive costume jewelry" is promoted with "list prices" as high as $3,499.99. At best, Defendants' argument raises an issue of fact as to whether a consumer who purchases a Cartier knockoff bracelet from Overstock for $1,499.99 would also purchase genuine Gucci earrings for $390. Plaintiffs have standing to assert their false advertising claims, and Defendants are not entitled to summary judgment on these claims.

### F.     Defendants Have Engaged In Deceptive Trade Practices

Defendants contend that Plaintiffs cannot sustain their claims for deceptive trade practices under N.Y. Gen. Bus. Law § 349 because Defendants' sale of infringing products does not "pose a risk to the public health or safety." Defs' Br. at 31. Defendants' argument is inapposite, as it does not address Plaintiffs' claim. Plaintiffs' Section 349 claim is not premised on Defendants' sale of infringing products, but rather on the deceptive manner in which Defendants market and sell such products. Specifically, Plaintiffs allege that Defendants' fraudulent use of fictitious "list prices" has caused consumer injury. Defendants have failed to address this argument.[14]

Because Section 349 is modeled after the Federal Trade Commission Act, federal courts often look to whether the allegations supporting the claim could trigger Federal Trade

---

[14] To prove a claim under Section 349, a plaintiff must show: (1) that the act was consumer-oriented; (2) that the act was misleading in a material respect and (3) that the plaintiff was injured as a result of the deceptive act. *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995). Proof of actual harm to the public, while relevant, is not necessary to prevail on a claim under Section 349. Instead, a plaintiff only needs to demonstrate that the defendant's "acts or practices have a broader impact on the consumer at large" in that they may "potentially affect similarly situated consumers." *Oswego Laborer's Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25-26 (1995).

Commission ("FTC") intervention. *Sports Traveler, Inc. v. Advance Magazine Publishers, Inc.*, 1997 WL 137443, at *2 (S.D.N.Y. 1997). A review of the FTC regulations concerning a retailer's deceptive use of "list prices" confirms that Plaintiffs' Section 349 claim is on solid ground. FTC regulations caution that:

> a retailer who advertises a manufacturer's or distributor's suggested retail price should be careful to avoid creating a false impression that he is offering a reduction from the price at which the product is generally sold . . . . It bears repeating that the . . . retailer must in every case act honestly and in good faith in advertising a list price, and not with the intention of establishing a basis . . . for a deceptive comparison . . . .

16 C.F.R. § 233.4.[15] Defendants' use of fictitious "list prices" is neither honest nor in good faith. Rather, Defendants employ drastically inflated "list prices" to entice unwitting consumers not only to purchase goods they think are real, but to purchase them at prices much greater than their actual value. For example, one of Defendants' most popular products, a "David Yurman Albion Inspired Replica Cushion Cut Double Cable Ring", was marketed with a fictitious "list price" of $189.99 and a seemingly reasonable "our price" of $49.99. The reality is that Defendants purchase this product for approximately $18.00, meaning that Defendants' fictitious "list price" was over ten times their cost. Ederer Decl. ¶8(vi), Ex. G. Based on the foregoing, Plaintiffs have stated a viable claim under New York General Business Law § 349.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion for partial summary judgment in all respects.

---

[15] Notably, the FTC's "Guides for the Jewelry, Precious Metals, and Pewter Industries", also states "[i]t is unfair or deceptive to misrepresent the type, kind, grade, quality, quantity, metallic content, size, weight, cut, color, character, treatment, substance, durability, serviceability, origin, *price*, *value*, preparation, production, manufacture, distribution, or any other material aspect of an industry product." 16 C.F.R. Part 23 § 23.1 (emphasis added).

Dated: New York, New York
      July 3, 2008

                ARNOLD & PORTER LLP

                By: _____
                    Louis S. Ederer
                    John Maltbie
                    Matthew T. Salzmann
                    399 Park Avenue
                    New York, New York 10022
                    Telephone:  (212) 715-1000
                    Facsimile:  (212) 715-1399

                    *Attorneys for Plaintiffs*