**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x
                                 :

YURMAN STUDIO, INC. and YURMAN     :     Civil Action No. 07-1241 (SAS)(HP)
DESIGN, INC.,                        :     (Action No. 1)
                                   :

        Plaintiffs/Counter-Defendants,   :

    - against -                   :

ELENA CASTANEDA and EJEWELER LLC   :
d/b/a OVERSTOCKJEWELER.COM,      :

        Defendants/Counter-Plaintiffs.   :

---------------------------------------------------------- x
---------------------------------------------------------- x
                                 :

CARTIER, a division of RICHEMONT NORTH     Civil Action No. 07-7862 (SAS)(HP)
AMERICA, INC., CARTIER INTERNATIONAL,  :    (Action No. 2)
N.V., CARTIER CREATION STUDIO, S.A., VAN :
CLEEF & ARPELS S.A., VAN CLEEF &      :
ARPELS, INC., VAN CLEEF & ARPELS      :
DISTRIBUTION, INC., GUCCI AMERICA, INC., :
and BULGARI S.p.A.,                :

        Plaintiffs,               :

    - against -                   :

ELENA CASTANEDA and EJEWELER LLC   :
d/b/a OVERSTOCKJEWELER.COM,      :

        Defendants.           :

---------------------------------------------------------- x

**COUNTER-STATEMENT OF MATERIAL FACTS PURSUANT**
**TO LOCAL CIVIL RULE 56.1(b) IN OPPOSITION TO DEFENDANTS'**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

In accordance with Rule 56.1 of the Local Civil Rules of the United States District Court

for the Southern District of New York, Plaintiffs Yurman Studio, Inc., Yurman Design, Inc.

("Yurman"), Cartier, a division of Richemont North America, Inc., Cartier International, N.V.,

Cartier Creation Studio, S.A. ("Cartier"), Van Cleef & Arpels S.A., Van Cleef & Arpels, Inc.,

Van Cleef & Arpels Distribution, Inc. ("Van Cleef & Arpels"), Gucci America, Inc. ("Gucci")

and Bulgari S.p.A. ("Bulgari") (collectively "Plaintiffs") respectfully submit this Counter-

Statement of Material Facts in response to the Statement of Material Facts submitted by

Defendants in support of their Motion for Partial Summary Judgment.

1.     Ejeweler LLC owns and operates the web-site Overstockjeweler.com, which began operating in 2004 and sells costume jewelry. (Exh. A, pp 21, 814, 815). Overstockjeweler.com does not design or manufacture any of the jewelry it sells. (Exh. A, pp 156, 157). Ejeweler LLC is owned by Elena Castaneda. (Ex. A, p. 16).

***Response of Plaintiffs***:

(1)     Plaintiffs do not dispute that Ejeweler LLC owns and operates the website

Overstockjeweler.com and that Ejeweler LLC is owned by Elena Castaneda. Plaintiffs further

do not dispute that Ejeweler LLC does not manufacture any of the jewelry it sells, despite the

statement appearing on Overstockjeweler.com that "[o]ur jewelry is custom made . . . ." (Ederer

Decl. ¶ 8(vii), Ex. G). Plaintiffs also do not dispute that Defendants claim that they do not

design any of the products they sell. Plaintiffs, however, dispute the credibility of the testimony

that supports this proposition. Plaintiffs also dispute that Overstockjeweler.com began operating

in 2004, as Castaneda testified that the website was "up and running by October" of 2002.

(Ederer Decl. ¶ 2, Ex. A at 79:6-25). Moreover, Plaintiffs dispute the fact that

Overstockjeweler.com only sells "costume jewelry". Overstockjeweler.com sells various types

of jewelry, including gold and diamond jewelry, which it sells for prices as high as $1,599.99.

(Ederer Decl. ¶ 6(v), Ex. E).

2.     Ms. Castaneda views the competitors of Overstockjeweler.com to be the web-sites evesaddition.com, emitations.com and inspiredsilver.com, which also sell costume jewelry. (Exh. A, p. 726).

***Response of Plaintiffs***:

(2)    Plaintiffs have no basis upon which to dispute or concede who Castaneda "views the competitors of Overstockjeweler.com to be". Plaintiffs, however, point out that none of Defendants purported competitors utilize Plaintiffs' brand names or trademarks to promote the products they sell.

3.    The costume jewelry available for sale on Overstockjeweler.com is similar to and inspired by well known designers, such as 'David Yurman', 'Van Cleef', 'Cartier', 'Bulgari' and 'Gucci'. (Exh. A, p. 23). The price range for this costume jewelry is from $29.99 through $179.99 at the top end. (Ex. B). Some of Overstockjeweler.com's costume jewelry contains cubic zirconia, referenced on the web-site as 'CZ', but none of it contains diamonds. (Exh. C, p. 83).

***Response of Plaintiffs***:

(3)    Plaintiffs do not dispute that the jewelry available for sale on Overstockjeweler.com appears similar, and in many cases identical, to jewelry items designed by Yurman, Van Cleef & Arpels, Cartier, Bulgari and Gucci, or that some of Overstockjeweler.com's jewelry contains cubic zirconia. Plaintiffs, however, dispute that Defendants have any knowledge as to inspiration for creating these knockoff products, other than that they were intended to be knockoffs of jewelry items designed by Yurman, Van Cleef & Arpels, Cartier, Bulgari and Gucci (Ederer Decl. ¶ 2, Ex. A at 290:14-18 ("I don't know what was in the designer's head")). The corporate representative of P & K Jewelry, Overstockjeweler.com's "biggest supplier" (*see* Defendants' 56.1 Statement ¶ 8), testified that he is not aware of any instance where one of P & K Jewelry's suppliers has referred to Yurman, Van Cleef & Arpels, Cartier, Bulgari and Gucci as being the "inspiration" behind any of the jewelry items they sell. (Ederer Decl. ¶ 4, Ex. C at 81:19 - 82:4, 84:4-8). Plaintiffs further dispute that the top-end price for jewelry items offered for sale and sold on Overstockjeweler.com is $179.99; several of the items at issue in this case retail for much more

than that, and one of the Overstockjeweler.com items at issue in this matter retails on

Defendants' website for $1,499.99, and has a "list price" of $3,499.99. (Ederer Decl. ¶ 6(i), Ex.

E). Plaintiffs also dispute the contention that none of the jewelry available on

Overstockjeweler.com contains real diamonds. There are over twenty-three jewelry items

available on Overstockjeweler.com, including knockoff Cartier, Bulgari and Yurman designs,

that purport to contain genuine diamonds. (Ederer Decl. ¶ 6(vi), (vii), (viii), Ex. E).

        4.      In displaying its jewelry, Overstockjeweler.com describes its similarity with well
known designers by using the word 'inspired' before or after the name of the designer or one of
its jewelry collections. In the past, Overstockjeweler.com had also used the terms "knock-off",
"replica", "imitation", "copy", "reproduction", "faux" and "-esque" to make this comparison, but
has ceased doing so.

        ***Response of Plaintiffs***:

        (4)     Plaintiffs do not dispute that Overstockjeweler.com refers, in certain instances, to

the jewelry items it sells as being "inspired" by a particular designer and/or jewelry collection,

and that Overstockjeweler.com uses the terms "knock-off", "replica", "imitation", "copy",

"reproduction", "faux" and "-esque" to describe many of the jewelry items it sells. Plaintiffs,

however, dispute the contention that Overstockjeweler.com has ceased using the terms "knock-

off", "replica", "imitation", "copy", "faux" and "-esque" to describe the products it sells.

(Ederer Decl. ¶ 6(iii), (iv), Ex. E).

        5.      Importantly, each web-page on Overstockjeweler.com which offers a jewelry
product contains a link to a detailed disclaimer in which Overstockjeweler.com makes it
abundantly clear that its jewelry products are not made, sponsored or endorsed by the designers
to whose jewelry they are similar. (Exh. E). In bold capital letters, that disclaimer's title is
OVERSTOCKJEWELER DOES NOT SELL ITEMS MANUFACTURED OR LICENSED BY
ANY FAMOUS DESIGNER. (Exh. E). The disclaimer also indicates that, if anyone can
demonstrate that an item which it sells infringes their intellectual property rights, it will cease
selling that item. (Exh. A, p. 174). Tiffany is an example of a designer who demonstrated that
they owned intellectual property rights in certain designs which were similar to those sold by
Overstockjeweler.com, and which Overstockjeweler.com ceased selling. (Exh. A, pp. 193, 194).

*__Response of Plaintiffs__*:

(5)    Plaintiffs do not dispute that each webpage on Overstockjeweler.com which offers a jewelry product contains a hyperlink labeled "disclaimer", that the words OVERSTOCKJEWELER DOES NOT SELL ITEMS MANUFACTURED OR LICENSED BY ANY FAMOUS DESIGNER appear at the top of the "disclaimer" page if visited, and that the following text appears on the "disclaimer" page:

> We sell affordable quality jewelry that are inspired by popular designs found in the public domain, or adaptations of designs that are comparable in quality and to products sold by famous designers and manufacturers. They do NOT come stamped with the designer's logo or in a logo box.
>
> Occasionally, we stock and advertise a product that appears to be a copy of a protected work. Because we respect the intellectual property rights of third parties, it is Overstockjeweler's policy to suspend the sale of any item claimed to be infringing, provided the third party owner offers reasonable substantiation of such claim so as to permit our staff and legal counsel to conduct an investigation.

(Zarin Decl. Exh. E).  Plaintiffs, however, dispute that Overstockjeweler.com's "disclaimer" "makes it abundantly clear that its jewelry products are not made, sponsored or endorsed by the designers to whose jewelry they are similar", as Defendants have failed to introduce any evidence corroborating the purported effectiveness of its disclaimer.  Plaintiffs further dispute the contention that Overstockjeweler.com ceases selling any products on the basis that an owner of intellectual property has offered reasonable substantiation of its rights.  In particular, Plaintiffs dispute that Defendants ceased selling any Tiffany knockoffs on the basis of any demonstration by Tiffany of its intellectual property rights.  Contrary to that assertion, Castaneda testified that "it was a business decision to remove" a handful of Tiffany "inspired" items, and that "[n]obody [has ever] offered me reasonable [substantiation]" of their intellectual property rights.  (Ederer Decl. ¶ 2, Ex. A at 216:3 - 217:16).  Defendants continue to sell over 700 Tiffany "inspired"

items today.

6.      Ejeweler determines that a piece of jewelry which it sells is similar to, or inspired by, a 'David Yurman', 'Cartier', 'Van Cleef', 'Gucci' or 'Bulgari' jewelry piece, and any of these designers' collections, either through the suppliers from whom it purchases the jewelry, who often provide Ejeweler with this information when Ejeweler's employees visit them to purchase jewelry, or through having seen a piece sold by one of those designers in a magazine or newspaper. (Exh. A, pp. 168, 171, 267, 272, 311, 606, 607, 610; Exh. C, pp. 27, 39, 40, 56, 57, 62). Neither Ms. Castaneda nor any Ejeweler employee has ever specifically requested from a supplier jewelry pieces which are similar to those of 'David Yurman', 'Cartier', 'Van Cleef', 'Gucci' or 'Bulgari' or any of these designers' collections. (Exh. C, pp. 30, 38, 39, 72, 73).

### *Response of Plaintiffs*:

(6)      Plaintiffs do not dispute that Defendants allege that they determine whether a piece of jewelry they sell is similar to a Yurman, Cartier, Van Cleef & Arpels, Gucci or Bulgari jewelry piece either through the suppliers from whom they purchase the jewelry pieces, or through having seen the pieces sold by one of those designers in a magazine or newspaper. Plaintiffs further do not dispute that Defendants allege that they never specifically requested from a supplier jewelry pieces which are similar to those of Yurman, Cartier, Van Cleef & Arpels, Gucci or Bulgari or any of these designers' collections. Plaintiffs, however, dispute the credibility and veracity of the testimony purportedly supporting each of these allegations.

7.      In using the term "knock-off", "replica", "imitation", "copy", "reproduction", "faux", "-esque" and "inspired" to describe the jewelry on its website Overstockjeweler.com, Ejeweler has always intended to communicate to the consumers its opinion that the jewelry is "similar to" the jewelry of the particular designer to which the words refer, but that it is *not* a genuine jewelry piece created and produced by that designer. (Exh. A, pp. 70, 72, 74, 75, 297, 305, 314, 376, 395, 396, 435, 437, 455, 461, 462, 501, 513, 514, 552, 553, 571, 572, 593, 649, 650, 681, 684, 795, 796). Moreover, it also does *not* intend to suggest to the consumer that the jewelry to which it refers is an exact replica or copy of that designer's jewelry. (Exh. A, p. 71).

### *Response of Plaintiffs*:

(7)      Plaintiffs dispute the contention that Overstockjeweler.com does not intend to suggest to its consumers that the jewelry it describes on its website as being "knock-offs", "replicas", "imitations", "copies", "reproductions", "faux" or "-esque" are genuine jewelry

pieces created by the designers who purportedly "inspired" them, as there are many references and indicia on Defendants' website that suggest that the items Defendants are selling are genuine. Plaintiffs further dispute the contention that Defendants' use of the terms "knock-offs", "replicas", "imitations", "copies", "reproductions", "faux" and "-esque" is not intended to suggest to the consumer that Defendants' products are "exact" replicas or copies of Plaintiffs' jewelry designs. Defendants' own product descriptions directly controvert these allegations, as they often refer to their jewelry pieces as being *"exact replicas"* of Plaintiffs' jewelry designs. (Ederer Decl. ¶ 6(ix), Ex. E ("[t]his David Yurman copy ring is an *exact replica* of the one made by David Yurman")).

8.      Overstockjeweler.com sells the overstock of its suppliers, such as its biggest supplier P & K Jewelry, which buy large quantities of jewelry from a manufacturer in order to obtain a highly discounted price. (Exh. A, pp. 122, 123; Exh. C, p. 33). Based upon her long experience in the retail industry, Ms. Castaneda believes Overstockjeweler.com's customers understand that it is the suppliers' overstock, and not the overstock of any of the designers to which Overstockjeweler.com compares its jewelry, such as David Yurman, Bulgari, Gucci, Van Cleef or Cartier, which they are buying. (Exh. A, pp. 121, 122, 124, 125, 126).

### *Response of Plaintiffs*:

(8)     Plaintiffs dispute the contention that Overstockjeweler.com sells the overstock of its suppliers, including overstock of its biggest supplier P & K Jewelry. P & K Jewelry's corporate representative, Hiro Dasani, testified that "it's a rare occurrence" for P & K Jewelry to have overstock product to sell. (Ederer Decl. ¶ 4, Ex. C at 79:24 - 80:13). On the contrary, Plaintiffs contend that Defendants' use of the word "overstock" is intended to mislead consumers into believing that Defendants are selling the overstock of Plaintiffs' authentic goods.

9.      In deciding what types of jewelry items to sell, Ejeweler relies upon its suppliers, who inform it which items its competitors are selling and which items are selling well in the market. (Exh. A, pp. 172, 173, 773; Exh. C, pp. 35, 36, 37).

***Response of Plaintiffs***:

(9)    Plaintiffs do not dispute that Defendants allege that in deciding what types of jewelry items to sell, they rely upon their suppliers, who inform them which items their competitors are selling and which items are selling well in the market. Plaintiffs, however, dispute the credibility and veracity of the testimony purportedly supporting these allegations.

10.    Alice Limantara is the buyer of the jewelry products sold by Overstockjeweler.com. (Exh. C, pp 10, 12, 14). Once she learns from a supplier or a magazine or newspaper to which designer or designer's collection a jewelry piece is similar, Ms. Limantara provides that the information to Matt Gilbert (or his predecessor), who writes the copy for the web-site and uses it to describe Overstockjeweler.com's similar product. (Exh. C, pp. 57, 67, 68, 77, 81, 82, 83, 90, 91).

***Response of Plaintiffs***:

(10)    Plaintiffs dispute the contention that "Alice Limantara is the buyer of the jewelry products sold by Overstockjeweler.com" to the extent this statement is intended to imply that Ms. Limantara is the only Overstockjeweler.com employee who has purchased the jewelry products at issue in this action on behalf of Overstockjeweler.com. Castaneda has also purchased product for Overstockjeweler.com and, in fact, was the person who initially purchased and provided product descriptions for certain of the jewelry products at issue. (Ederer Decl. ¶ 2, Ex. A at 172:17 - 173:15). Plaintiffs also dispute the credibility and veracity of the testimony supporting Defendants' contention that they learn from either their suppliers or a magazine or newspaper which designer or designer's collection a knockoff jewelry piece they sell is similar to.

11.    Ms. Limantara specifically recalls learning from Overstockjeweler.com's suppliers that several pieces sold by Overstockjeweler.com are inspired by, and similar to, jewelry pieces in Van Cleef's Alhambra collection and Bulgari's Astrale and Spiga collections. (Exh. C, pp. 84, 85, 86, 87, 94, 95, 116). Ms. Limantara also recalls providing Mr. Gilbert or his predecessor with information regarding the similarity of certain Overstockjeweler.com products to that of Cartier's Love and Agrafe collections, and David Yurman's Albion collection. (Exh. C, pp. 70, 76, 77, 80, 81).

***Response of Plaintiffs*:**

(11)    Plaintiffs dispute that Ms. Limantara "specifically" recalls anything about her purchases of jewelry products from Overstockjeweler's suppliers. Ms. Limantara, when questioned during her deposition, was unable to recall the names of any of the salespeople who purportedly informed her that certain pieces of jewelry she purchased were similar to jewelry pieces in Van Cleef & Arpels' Alhambra collection and Bulgari's Astrale and Spiga collections. This is despite the fact that Ms. Limantara visits these suppliers multiple times a week. (Ederer Decl. ¶ 3, Ex. B at 15:2 - 25:14)

12.    Before one of her employee's posted the terms 'Albion Collection', 'Madison Collection' and 'Alhambra Collection' on the web-site to draw a comparison between one of Overstockjeweler.com's jewelry products and a product in one of those collections, Ms. Castaneda never heard of David Yurman's Albion collection, David Yurman's Madison collection or Van Cleef's Alhambra collection. (Exh. A, pp. 266, 268, 269, 542, 543). Ms. Castaneda has stated that she does "not willfully sell any products" which infringe on anyone's intellectual property rights. (Ex. A, p. 223).

***Response of Plaintiffs*:**

(12)    Plaintiffs do not dispute that Castaneda claims that she had not heard of David Yurman's Albion collection or Madison collection when those terms were initially used on Overstockjeweler.com. Plaintiffs, however, dispute that Castaneda had not heard of Van Cleef & Arpels' Alhambra collection when that term was initially used on Overstockjeweler.com. Castaneda testified that the word "Alhambra" was placed on Overstockjeweler.com after she purportedly saw an advertisement for Van Cleef & Arpels' Alhambra collection in the New York Times — implying that she was the one who caused the word "Alhambra" to appear on Overstockjeweler.com. (Zarin Decl. Ex. A at 267:20 - 268:23).

13.    It is not the practice of any buyer in the retail industry to conduct research, before beginning to sell a product, as to whether the product infringes anyone's intellectual property rights. For this reason, and because Overstockjeweler.com sells between 3,000 and 4,000 jewelry products, making it impossible, as a practical matter, to conduct such research, Ms. Castaneda does not generally take any special steps, upon deciding to sell a jewelry product

which Ejeweler believes is inspired by or similar to a designer piece, to determine whether or not the designer has any intellectual property rights in the design. (Exh. A, pp. 173, 174, 223, 224, 423, 557; Exh. C, p. 63).

### *Response of Plaintiffs*:

(13)   Plaintiffs do not dispute that Defendants take no steps and conduct no research to

determine whether the products they sell infringe anyone's intellectual property rights —

including the Plaintiffs whom Defendants claim provided the "inspiration" for the products.

Plaintiffs, however, dispute the contention that it is not the practice of "any buyer in the retail

industry to conduct research, before beginning to sell a product, as to whether the product

infringes anyone's intellectual property rights".   No evidence has been introduced to support

such a broad proposition, and Castaneda surely is not qualified as an expert on the issue.

Plaintiffs further dispute the contention that Overstockjeweler.com sells between 3,000 and

4,000 items.  According to Defendants' own website, Overstockjeweler.com presently offers

2,340 items (approximately 515 of which Defendants market using Plaintiffs' registered

trademarks).  (Ederer Decl. ¶ 8(ii), Ex. G).

14.    Overstockjeweler.com has received customer reviews both through Yahoo's independent customer reviews and on forms, created by Ejeweler for returns, sent to Overstockjeweler.com along with returned items. (Exh. A, pp. 232, 233, 376, 377, 378). Although some of the Overstockjeweler.com's reviews have been negative, since starting operations in 2004, not one customer has ever complained that she or he thought, at the time they bought the item, that it was a genuine jewelry piece from David Yurman, Cartier, Van Cleef, Gucci or Bulgari. (Exh. F).  Moreover, Ms. Castaneda has testified that she is not aware of any instance in which a customer thought, at the time they bought the item, that they were purchasing an actual piece by one of those designers. (Exh. A, pp. 245, 246).

### *Response of Plaintiffs*:

(14)   Plaintiffs do not dispute that Overstockjeweler.com has received negative

customer reviews through Yahoo's independent customer review system and

Overstockjeweler.com's own product return forms.  Plaintiffs, however, dispute that not one

customer has ever complained that she thought, at the time she bought an Overstock Jeweler

item, that it was a genuine jewelry piece from Yurman, Cartier, Van Cleef & Arpels, Gucci or

Bulgari. That determination cannot be made, because Defendants admit destroying — after

these litigations were commenced — the very product return forms that would reflect such

confusion. When asked during her deposition if Defendants have received any product return

forms following the commencement these actions concerning the products at issue, Castaneda

testified that they had, but that they had all been discarded. (Ederer Decl. ¶ 2, Ex. A at 234:5-

18). Accordingly, Defendants have only produced product return forms for orders placed in

January and February 2008 (418 product return forms). Plaintiffs further dispute the contention

that Overstockjeweler.com began operations in 2004 (*see* Response of Plaintiffs to ¶ 1).

15.    Upon conducting a search on Google, Yahoo and MSN, an internet search engine,
a web-site can pay the search engine to cause a link to it to appear when 'key-words' of its
choice are typed into the search box by the user; a service known as "pay per click". A link to
the web-site may also appear automatically without any instruction from the web-site; this
feature is known as "natural listings" and web-site lacks control over it. (Exh. A, pp. 91, 92, 95,
96).

### *Response of Plaintiffs*:

Plaintiffs dispute the contention that a website, including Overstockjeweler.com, "lacks

control" over the natural listing algorithms used by search engines such as Google, Yahoo and

MSN. Overstockjeweler.com deliberately engages a third party who is dedicated to "pump up"

the website with references to Yurman, Cartier, Van Cleef & Arpels, Gucci and Bulgari, so that

when an individual searches for those words through a search engine such as Google, Yahoo or

MSN, the Overstockjeweler.com website will appear at the top of the results list. (Ederer Decl. ¶

2, Ex. A at 26:5-27:9). Indeed, this is precisely what occurs when Plaintiffs' names are searched.

16.    Ejeweler has never used Google, Yahoo or MSN's "pay per click" services for the
purpose of causing Overstockjeweler to appear when a user types the key words 'Cartier', 'Van
Cleef', 'Gucci' or 'Bulgari'. (Exh. A, p. 96). For a short time more than two years ago, however,
Ejeweler used Google and Yahoo's "pay per click" service for purpose of causing
Overstockjeweler.com to appear when a user typed the name 'David Yurman' into the search
boxes of those search engines, but ceased doing so shortly after it began because it lost money

using these services. (Exh. A, pp. 91, 92, 97, 98). Moreover, for a short time several months ago, Ejeweler used MSN's "pay per click" service for the purpose of causing Overstockjeweler.com to appear when a user typed the name 'David Yurman' into its search box, but has since ceased doing so. Currently, therefore, Ejeweler does not use Google, Yahoo or MSN's "pay per click" services for the purpose of causing Overstockjeweler.com to appear when 'David Yurman', 'Cartier', 'Bulgari', 'Gucci' or 'Van Cleef', or any of their collection names, are types into the search box. (Exh. A, pp. 98, 99).

### ***Response of Plaintiffs***:

Plaintiffs do not dispute that Ejeweler has used Google's and Yahoo's "pay per click" services to cause the Overstockjeweler.com website to appear when a user of either Google's or Yahoo's search engines searches for the name "David Yurman". As Defendants have failed to produce any documents reflecting its "pay per click" agreements with Google or Yahoo, Plaintiffs, however, cannot dispute or concede that Ejeweler is not continuing to use such services today, or that Ejeweler has not used such services in connection with other terms, such as, "Cartier", "Van Cleef & Arpels", "Gucci" or "Bulgari".

Moreover, while Defendants do not dispute that Ejeweler has recently utilized MSN's "pay per click" services, Plaintiffs dispute the contention that Defendants are not continuing to use those services today, and that such services were used only in connection with the term "David Yurman". Contrary to Castaneda's unequivocal deposition testimony on February 7, 2008, that "none" of the MSN "pay per click" terms contain the words "David Yurman", documents subsequently produced by Defendants reveal that at that very time, two of the MSN "pay per click" terms paid for by Overstockjeweler.com were "David Yurman Replica" and "David Yurman Ring". (Zarin Decl. Ex. A at 98:21 - 99:5; Ederer Decl. ¶ 8(ix), Ex. G). Therefore this entire contention, and Castaneda's testimony on this issue, defies credibility.

Furthermore, although Castaneda testified that Overstockjeweler.com has not advertised with Google "for over two years", a Google search for the words "Overstock Jeweler" reveals that Overstockjeweler.com is a paid for "sponsored link". (Zarin Decl. Ex. A at 91:11 - 92:14;

Ederer Decl. ¶ 8(viii), Ex. G).

*Cartier*

17.     Cartier sells high end watches and jewelry for as much as $50,000 for its 'high jewelry', unique jewelry with a unique set of stones. (Exh. A, p. 72; Ex. B).

*Response of Cartier*:

(17)     Cartier does not dispute that it sells high end watches and jewelry, and that a

certain small number of Cartier's "high jewelry" pieces sell for as much as $50,000.  However,

Cartier also sells jewelry pieces, including pieces at issue in this action, for as little as $1,550.

(Ederer Decl. ¶ 7, Ex. F).[1]

18.     Cartier has a design studio at its headquarters, in Paris, France, where it employs a team of designers who design all of its jewelry. (Exh. A, pp. 35, 88).  These designers, not Cartier, own the copyrights in the jewelry pieces manufactured and sold by Cartier.  Cartier has not produced any evidence that the designers have transferred their copyrights to Cartier. (Ex. G).

*Response of Cartier*:

(18)     Cartier does not dispute that it has a design studio at its headquarters in Paris,

France, where it employs a team of designers who design Cartier jewelry.  Cartier, however,

does dispute that Cartier designers, and not Cartier, own the copyrights in jewelry pieces

manufactured and sold by Cartier.  As such designs are collective works, Cartier is the owner of

the copyrights in the works created by Cartier designers in Cartier's design studio, as a matter of

law.  (Dube Decl. ¶ 3, Ex. A).

19.     Cartier only sells its jewelry products in its own retail stores, which are owned and operated by Cartier. (Exh. A, pp. 10, 11, 12).  It sells its watch products in both its own retail stores and in select independent jewelry stores, known in the jewelry industry as multi-brand stores. (Exh. A, p. 13).

L

[1] Cartier further disputes the allegations contained in paragraphs 17 - 22 of Defendants' Statement of Material Facts on the grounds that Defendants' citations do not support the allegations asserted in such paragraphs.

***Response of Cartier***:

(19)    Undisputed.

20.    Cartier does not sell all its jewelry and watch products at each of its retail stores. To determine which products to sell at each store, it considers the quality of the sales associates in a store and the market in which the store is located and which it serves. (Exh. A, pp. 61, 62, 63).

***Response of Cartier***:

(20)    Undisputed.

21.    Cartier maintains a web-site, but it is purely for informational purposes and customers cannot purchase Cartier products through it. (Exh. A, p. 12).

***Response of Cartier***:

(21)    Undisputed.

22.    Cartier is committed to training and educating its sales force, offering them seminars in which it provides detailed information about its products and collections, including information about the inspiration for the collections. (Exh. A, pp. 39, 43, 44, 45).

***Response of Cartier***:

(22)    Undisputed.

### Van Cleef & Arpels

23.    Van Cleef, a purveyor of fine jewelry, categorizes its jewelry as 'bijoux', which ranges in price from $600 to $37,000, 'classical', which ranges from $15,000 to $150,000, and 'high jewelry', which ranges from $50,000 to several million dollars. (Exh. H, pp. 156-58; Exh. B). Upon a customer's request, Van Cleef also makes custom made jewelry to suit a customers wishes. (Exh. H, p. 136).

***Response of Van Cleef & Arpels***:

(23)    Undisputed.

24.    Van Cleef views its competition in the luxury jewelry market as Harry Winston, Bvlgari, Tiffany, Cartier, Graff, Pasha and Mont Blanc. (Exh. H, pp. 149, 150).

***Response of Van Cleef & Arpels***:

(24)    Van Cleef & Arpels disputes the contention that it views its competition in the

luxury jewelry market as Mont Blanc.  Mr. Nicolas Luchsinger testified that Mont Blanc is,

along with Van Cleef & Arpels, owned by Richemont, and is not considered a competitor of Van

Cleef & Arpels.  (Zarin Decl. Ex. H at 149:18 - 150:5).

   25. Van Cleef has a team of jewelry designers, who design all Van Cleef jewelry, at
its design workshop at Place Vendome in Paris. (Exh. I, pp. 50, 51).  These designers, not Van
Cleef, own the copyrights in the jewelry pieces manufactured and sold by Van Cleef.  Van
Cleef's Envol ring was designed and is owned by Madame Carbarbaye. (Exh. I, pp. 40, 41).  Van
Cleef's Modern Alhambra ring was designed and is owned by Madam Guichot.  (Exh. I, pp. 56,
57, 58).  Van Cleef's Vintage Alhambra ring was designed and is owned by Madam Roussier.
(Exh. I, pp. 60, 62, 63).  Van Cleef's Vintage Alhambra necklace was also designed and is also
owned by Madam Roussier. (Exh. I, p. 120).  Van Cleef has not produced any evidence that
these designers have transferred their copyrights to Van Cleef. (Ex. G).

   ***Response of Van Cleef & Arpels***:

   Van Cleef & Arpels does not dispute that it employs a team of designers who work in its

design workshop in Paris.  Van Cleef & Arpels, however, does dispute that all Van Cleef &

Arpels' jewelry is designed by its team of internal designers.  Van Cleef & Arpels further

disputes that any of the designers of Van Cleef & Arpels jewelry, whether internal or external,

own the copyrights in the jewelry pieces sold by Van Cleef & Arpels.  All designs created by

Van Cleef & Arpels' internal design team are owned by Van Cleef & Arpels as a matter of law.

All Van Cleef & Arpels designs created by external designers are the subject of assignments.

That is the case with Van Cleef & Arpels' Envol ring.  (Gilbert-Zinck Decl. ¶¶ 3-12, Exs. A, B).

   26. Van Cleef manufactures its jewelry at two different locations; at its workshops in
Paris and at a workshop it maintains above its retail store in New York. (Exh. H, p. 63; Exh. I,
pp. 38, 39, 116).  No Van Cleef jewelry, however, is designed at the workshop in New York.
(Exh. I, p. 117; Exh. H, p. 65).

   ***Response of Van Cleef & Arpels***:

   (26) Undisputed.

   27. Since 1906, every Van Cleef jewelry piece has been engraved with the Van Cleef
signature ("VCA") and its own product identification number. (Exh. H, p. 58; Exh. I, pp. 86, 87).
The product identification number indicates that it is a genuine Van Cleef product. (Exh. H, p.
62).

*Response of Van Cleef & Arpels*:

(27)    Undisputed.

28.    In addition to the Van Cleef 'VCA' signature, every Van Cleef 'high jewelry' piece also has engraved on it between the letters CV a column symbolizing the Place Vendome in Paris. (Exh. H, pp. 133-134; Exh. J).  Recently, Van Cleef also began to engrave an apple around the 'A' in its VCA signature on pieces manufactured in its New York workshop. (Exh. H, p. 134).

*Response of Van Cleef & Arpels*:

(28)    Undisputed.

29.    The diamonds used in all Van Cleef jewelry are of the highest quality; it uses D, E, and F quality diamonds with VVF or better clarity. (Exh. H, p. 54).

*Response of Van Cleef & Arpels*:

(29)    Van Cleef & Arpels does not dispute that the diamonds used in its jewelry are of

the highest quality (D, E and F), but does dispute that it uses diamonds with "VVF" or better

clarity — Mr. Nicolas Luchsinger testified that Van Cleef & Arpels uses diamonds with VVS or

better clarity.  (Zarin Decl. Ex. H at 54:4-10).

30.    Van Cleef sells its jewelry products almost exclusively through its retail stores, of which there are ten (10) throughout the United States, and through some high end independent jewelry stores. (Exh. I, pp. 14, 15, 16, 31, 32; Exh. H, p. 54).  Additionally, it sells in some Neiman Marcus department stores. (Exh. H, pp. 20, 57).  Van Cleef is "highly selective" in deciding which independent jewelry stores it allows to carry its products, because it wants to maintain a "luxury image." (Exh. H, pp. 24, 25).

*Response of Van Cleef & Arpels*:

(30)    Undisputed.

31.    Van Cleef engages in highly sophisticated and involved sales techniques.  The sales associates in its retail stores are educated about new products and collections by the retail stores managers when those products and collections arrive at the stores. (Exh. H, p. 31).

*Response of Van Cleef & Arpels*:

(31)    Undisputed.

32.    It is Van Cleef's policy not to list the retail prices of any of its products in its

advertising, as is the case with many luxury goods products. (Exh. H, p. 29). Often, in response to an advertisement placed by Van Cleef, a consumer will telephone a Van Cleef retail store to inquire about a jewelry product featured in that advertisement. (Exh. H, p. 28). When this occurs, the sales associate at the stores will either discuss the product over the phone or invite the caller to come to view the product and talk about it. (Exh. H, pp. 29, 30).

### *Response of Van Cleef & Arpels*:

(32)    Van Cleef & Arpels disputes the contention that "many luxury goods products"

are advertised without a retail price, as there is no evidence of record to support this statement.

33.    In an effort to sell products, Van Cleef's retail sales associates make an effort to develop a "relationship" with a prospective customer. (Exh. H, p. 43). After an individual has looked at a product in a retail store, the sales associate will then "follow up" with that individual by sending them a brochure and an e-mail, and calling them to inquire as to whether they like the product. (Exh. H, pp. 36, 37). And if the sales associate discovers, through conversation with the individual, that he or she will be traveling to a different city where there is a Van Cleef store and will be visiting that store, the sales associate will often call the other store to inform the sales staff of the customer's upcoming visit. (Exh. H, pp. 39, 40, 43).

### *Response of Van Cleef & Arpels*:

(33)    Undisputed.

34.    In order to attract new customers and introduce new collections, Van Cleef retail stores also frequently hosts special events, such as dinners and cocktail hours. (Exh. H, p. 32). At these events, Van Cleef sponsors a charity, which it specially chooses due to the "affluence" of its donors, and invites these donors to attend the event. (Exh. H, pp. 33, 34).

### *Response of Van Cleef & Arpels*:

(34)    Undisputed.

35.    Each month, the mangers of Van Cleef's retail stores engage in a conference call top discuss sales and new products. (Ex. H, p. 39). Nicolas Luchsinger is the manager of Van Cleef's New York store. (Ex. H, p. 19).

### *Response of Van Cleef & Arpels*:

(35)    Undisputed.

36.    On a few occasions, customers have brought jewelry pieces into Van Cleef's New York retail store for repair which they believed to be produced by Van Cleef and which appeared to belong to Van Cleef's 'Vintage Alhambra' collection, but which, upon examination by the store manager, were determined not to be genuine Van Cleef products. (Exh. H, pp. 58, 92, 93). The individuals bringing in these ersatz pieces to Van Cleef for repair indicated that they had

purchased the pieces at estate sales or through the internet, or had received them as gifts. (Exh. H, pp. 59, 60, 96). Importantly, however, if they purchased the item on the internet, none of these individuals ever indicated from which web-site they purchased it. (Exh. H, p. 96).

### Response of Van Cleef & Arpels:

(36)    Van Cleef & Arpels disputes Defendants use of the term "[i]mportantly" to

characterize the fact that none of the individuals who have brought knockoff Van Cleef & Arpels

products, like those sold by Defendants, into Van Cleef & Arpels stores for servicing have

identified the internet site from which they purchased the knockoff.

37.    No customer has ever brought a jewelry piece into Van Cleef's New York retail store for repair, or for any other reason, which they believed to be produced by Van Cleef and which appeared to be part of the 'Byzantine Alhambra' or 'Magic Alhambra' collections, or a watch or ring which appeared to be part of the 'Vintage Alhambra' collection, but which turned out instead to be a fake. (Exh. H, pp. 80, 99, 113, 125, 126, 132).

### Response of Van Cleef & Arpels:

(37)    Undisputed.

### Bulgari

38.    Bulgari sells high end jewelry to an upscale consumer who can afford its prices; that is, in the range of $900 to $50 million for jewelry, and $1,500 to $500,000 for watches. (Exh. K, p. 31; Exh. B). Bulgari has never, however, conducted any consumer surveys to determine a profile of their customers. (Exh. K, p. 26).

### Response of Bulgari:

(38)    Undisputed.

39.    Every piece of jewelry produced by Bulgari is engraved with the Bulgari name, sometimes on the outside of the piece so that it is visible. (Exh. K, p. 43; Exh. J).

### Response of Bulgari:

(39)    Undisputed.

40.    Bulgari is a "luxury brand" which only advertises in publications which it believes will uphold its standard of luxury; that is, publications which, like the brand, have a "tone and a style which is elegant, sophisticated and stays away from vulgarity." (Exh. K, p. 15).

*__Response of Bulgari__*:

(40)    Undisputed.

41.    Bulgari sells its jewelry and watch products through catalogs which it creates, its own Bulgari web-site, fifteen (15) retail stores which it owns an operates, some high end department stores, and independent jewelry stores, known in the jewelry business as multi-brand stores. (Exh. K, pp. 28, 29).

*__Response of Bulgari__*:

(41)    Undisputed.

*__Gucci__*

42.    All Gucci jewelry products are designed by Gucci's jewelry design team in Florence, Italy. (Exh. L, pp. 31, 66).  And each Gucci jewelry piece is engraved with the Gucci name. (Exh. L, pp. 79, 80; Exh. J).

*__Response of Gucci__*:

(42)    Undisputed.

43.    Gucci is very selective as to where it distributes its jewelry products. (Exh. L, p. 18).  In order to view Gucci's jewelry collection, an independent jewelry store or department store must schedule an appointment to attend Gucci's jewelry market, which is held twice annually at Gucci's offices in New York. (Exh. L, pp. 22, 23, 27).

*__Response of Gucci__*:

(43)    Undisputed.

44.    Gucci sells its jewelry products through its own Gucci web-site, fifteen (15) retail stores which it owns and operates, and a small number of high end independent jewelry stores and department stores, such as Barney's, Neiman Marcus, Nordstrom and Saks Fifth Avenue. (Exh. L, pp. 13, 14, 15, 19, 20, 91, 92).

*__Response of Gucci__*:

(44)    Undisputed.

45.    When selling its jewelry products, Gucci makes an effort to inform its customers about the history of the piece, which it often conveys to its independent jewelry stores upon their request. (Exh. L, p. 38).

***Response of Gucci***:

(45)    Undisputed.

46.    If a customer wants to purchase a piece which Gucci does not have in stock at any of its stores, it will create a custom order of that product for the customer. (Exh. L, p. 29).

***Response of Gucci***:

(46)    Undisputed.

47.    Gucci is aware of no instance where a customer brought a jewelry piece into a Gucci retail store, or independent jewelry store which sells Gucci jewelry, which the customer believed to be a genuine Gucci piece, but which turned out instead to be a fake. (Exh. L, p. 39).

***Response of Gucci***:

(47)    Undisputed.

**David Yurman**

48.    In 1982, David Yurman began to make and sell, through a company called Yurman Studio, Inc., fine jewelry whose primary feature was twisted cable. (Exh. M, pp. 19, 59). He did so by twisting together five (5) to seven (7) wires using an industrial process which he claims to have developed along with a company in Rhode Island. (Exh. M, pp. 62, 63, 64, 65). Before he began to create his jewelry in the early 1980s, however, Yurman admitted that he had seen jewelry created by someone else which contained twisted cable. (Exh. M, pp. 141, 142).

***Response of Yurman***:

(48)    Yurman disputes the contention that the "primary feature" of the jewelry David Yurman began designing in the early 1980s was twisted cable. Such jewelry features a unique combination of design elements, including a unique and innovative twisted cable design. While Yurman does not dispute that Mr. Yurman had seen jewelry which contained twisted cable prior to creating his own jewelry, Yurman disputes that any such jewelry contained the unique combination of design elements found in its jewelry. (Zarin Decl. Ex. M).

49.    Today, the Yurman company and its affiliates, including Yurman Design, Inc., have approximately three-hundred and seventy (370) employees. (Exh. M, p. 33). Currently, Janet Hayward is Vice President of Design, and Carol Pennelli is Executive Vice President of Sales and Marketing. (Exh. N, p. 49; Exh. O, p. 13).

*__Response of Yurman__*:

(49)    Undisputed.

50.    Since the inception of the company, David Yurman himself has designed all the jewelry Yurman sells. (Exh. M, pp. 27, 28). Yurman manufactures its products, however, in workshops in the United States, Switzerland, India, France, China and Bangkok which it authorizes and maintains quality control over. (Ex. M, p. 220). While some of these workshops manufacture component parts for the jewelry, others merely assemble it. (Exh. M, p. 133).

*__Response of Yurman__*:

(50)    Undisputed.

51.    Yurman bracelets, necklaces, pendants and earrings generally sell for in excess of $1,600 and often for as much as $5,000. (Exh. B). After Yurman creates a collection of jewelry, it adds different jewelry products to that collection, such as bracelets or rings, depending on whether the collection as a whole is selling well in the market. (Ex. N, p. 33). Each Yurman jewelry piece is engraved with the David Yurman name or initials. (Exh. J).

*__Response of Yurman__*:

(51)    Yurman disputes that its bracelets, necklaces, pendants and earrings generally sell

for in excess of $1,600 and often for as much as $5,000. Yurman's jewelry items, including

items that are being infringed by Defendants, retail for as little as $250. (Ederer Decl. ¶ 7, Ex. F).

52.    Yurman sells its jewelry products through its own retail stores, its own web-site and about one-hundred and seventy-five (175) select independent jewelry stores and high end national department stores, such as Saks Fifth Avenue, Neiman Marcus, Bloomingdales and Nordstrom. (Exh. M, pp. 34, 35, 38, 39, 123). Currently, Yurman owns and operates fifteen (15) retail stores throughout the United States, most of which have been opened in the last five (5) years. (Exh. M, pp. 34, 35; Exh. O, pp. 11, 12). If a customer wishes to purchase a product of which Yurman has no inventory, Yurman will manufacture that product especially upon the customer's request. (Exh. M, p. 215).

*__Response of Yurman__*:

(52)    Undisputed.

53.    Yurman does not allow all independent jewelry stores to carry its products. When deciding whether to permit any given store to do so, it interviews the proprietors of the store and looks at whether it "carr[ies] luxury products," and is "capable of representing [the Yurman] brand in the way that [Yurman] would like it to be represented," because Yurman "would like to be where other luxury products are shown." (Exh. M, pp. 42, 43; Exh. N, pp. 23, 24).

*__Response of Yurman__*:

(53)    Undisputed.

54.    When an independent retailer or other department store which sells Yurman jewelry wishes to view Yurman's new products, they must meet with a Yurman representative at Yurman's offices to view these products. (Ex. O, pp. 36, 37, 40).

*__Response of Yurman__*:

(54)    Undisputed.

55.    In deciding which "marketing vehicle", such as catalogs, direct mailers, magazines, newspapers and billboards, to market it jewelry products through, in addition to circulation and rates, Yurman looks for those vehicles which represent a "luxury experience for the consumer," because "[a]s a luxury brand [it] only want[s] to put [its] product in a luxury environment." (Exh. M, pp. 14, 15, 16, 18).

*__Response of Yurman__*:

(55)    Undisputed.

56.    To determine in which publications and issues to place print advertisements, Yurman looks at the publication's demographics, which are provided to it by the publication itself, and the content of a given issue of the publication. (Exh. N, pp. 37, 38).

*__Response of Yurman__*:

(56)    Undisputed.

57.    In national magazines, Yurman places advertisements containing a model wearing a piece of Yurman jewelry, the objective of which is to send the message that individuals with affluent lifestyles wear Yurman jewelry products. (Exh. O, p. 29).  On the other hand, in regional and local magazines, Yurman places advertisements containing only its jewelry products. (Exh. O, p. 29).

*__Response of Yurman__*:

(57)    Yurman disputes that the objective of its national advertising campaigns are "to send the message that individuals with affluent lifestyles wear Yurman jewelry products".  As Carol Pennelli, Yurman's Executive Vice President of Sales and Marketing, testified during her deposition, such advertisements are about a "lifestyle", not affluence.  (Zarin Decl. Ex. O at 27:23 - 28:10).

58.    In conjunction with a number of different department stores in which its products are sold, including Saks Fifth Avenue, Bloomingdales, Nordstrom and Neiman Marcus, Yurman creates direct market mailers which contain only Yurman products, are imprinted with the name and logo of the department store and are mailed by the department store.  In doing so, Yurman is making an effort to reach the high end consumer who shops at these department stores. (Exh. O, pp. 38, 39, 40, 41).

*Response of Yurman*:

(58)    Undisputed.

59.    Yurman's Executive Vice President for Sales and Marketing, Carol Pennelli, frequently speaks with the managers of the independent jewelry stores and department stores which sell its products in an effort to determine the "shopping trends" of the Yurman customer, such as whether she is purchasing more bracelets or necklaces, or more gold or silver. (Exh. O, pp. 33, 34, 35).  Surprisingly, however, Yurman has never conducted any consumer research to determine the demographics of its customers. (Exh. O, pp. 18, 19; Exh. M, p. 90).

*Response of Yurman*:

(59)    Yurman disputes Defendants' characterization of the fact that Yurman has not

conducted research to determine the demographics of its customers as "surprising".

60.    Carol Pennelli has apparently had several conversations with the managers of independent jewelry stores which sell Yurman products during which the manager told Pennelli that individuals had come into their stores with jewelry pieces which, upon examination, turned out not to be genuine David Yurman pieces. (Exh. O, pp. 76, 77, 78).  Interestingly, however, despite the fact that she claims that she had at least twenty (20) such conversations, Ms. Pennelli does not recall the details of those conversations or which stores were involved. (Exh. O, pp. 77, 78).  And importantly, during none of Ms. Pennelli's conversations have the mangers ever informed her where the customer bought the ersatz Yurman jewelry product. (Exh. O, p. 79).

*Response of Yurman*:

(60)    Yurman disputes Defendants' characterization of the facts set forth above as

"interesting" and "important".

***The Instant Lawsuit***

61.    In September 2005, David Yurman wrote to Ejeweler a letter demanding that it cease and desist from selling a number of jewelry products on its web-site, Overstockjeweler.com, which Yurman claimed to infringe the copyrights in a number of its designs. (Exh. A, p. 641).  At the time Yurman wrote Ejeweler this letter, a disclaimer was already posted on Overstockjeweler.com clearly indicating that its jewelry products are not made by David Yurman or any other designer to whose products they are similar.  In fact, Yurman

attached a copy of an Overstockjeweler.com web-page displaying this disclaimer to its cease and desist letter. (Exh. P; 4/12/05 Letter).

### *Response of Yurman*:

(61)    Yurman disputes that the "disclaimer" appearing on the Overstockjeweler.com website in September 2005 "clearly indicated" that Defendants' knockoff jewelry designs were not manufactured by, sponsored by or affiliated with Yurman.

62.    After David Yurman sent Overstockjeweler.com its cease and desist letter, but before David Yurman filed this lawsuit, Overstockjewler.com, in good faith, agreed to remove and in fact did, cease selling between ten (10) and fifteen (15) jewelry items which David Yurman claimed to infringe its copyrights. (Exh. A, pp. 218, 219; Exh. P). Upon the advice of its counsel at the time, Thomas Saunders, Esq., Ejeweler also offered to and in fact did, amend its disclaimer to even more clearly indicate that its products are in no way sponsored, endorsed or made by an designer, including David Yurman, Cartier, Bulgari, Gucci or Van Cleef, to which they are similar. (Exh. P; 3/31/05 Letter). This enhanced disclaimer, which has been previously noted, has been posted in Overstockjewler.com continuously since that time. (Exh. E).

### *Response of Yurman*:

Yurman disputes the contention that Overstockjeweler.com removed ten (10) to fifteen (15) of the jewelry items that infringed Yurman's copyrights in 2005. Yurman further disputes Defendants' contention that they acted in "good faith", that their disclaimer was "enhanced" or that their disclaimer was made "more clear" following the receipt of a cease and desist letter sent by Yurman to Defendants in 2005, and that they relied on the advice of counsel in purportedly "amending" their disclaimer.

63.    At around the same time that Overstockjeweler.com ceased selling a number of jewelry items which were similar to those of Yurman, David Yurman agreed to cease objecting to Overstockjeweler.com's sale of a number of jewelry items to which it had previously objected. (Exh. A, p. 219). Despite this agreement, however, on February 16, 2007, approximately two years later, Yurman Studio, Inc. filed a Complaint against Ejeweler and its proprietor, Elena Castaneda, in which it alleged copyright infringement of these same items, in addition to others. (Exh. A, pp. 219, 642, 643). Immediately after receiving the Complaint in this action, Ms. Castaneda referred it to her attorney. (Exh. A, pp. 220, 221).

### *Response of Plaintiffs*:

Yurman disputes the contention that it ever "agreed to cease objecting to

Overstockjeweler.com's sale of a number of jewelry items to which it had previously objected",

as no agreement was ever reached between Yurman and Overstockjeweler.com. In fact, Yurman

reserved all rights to pursue any and all claims against Defendants. Yurman further disputes that

the items complained of in September 2005 are the "same items" at issue in the instant action.

(Ederer Decl. ¶ 9, Ex. H).

   64. In that Complaint, which Yurman Studio, Inc. later amended to add an associated
entity, Yurman Design, Inc. (collectively "Yurman"), Yurman asserted claims for trademark
Infringement (First and Nineteenth Claims for Relief), False Designation of Origin (Second
Claim for Relief), False Advertising (Third Claim for Relief), Trademark Dilution (Fourth Claim
for Relief), Trade Dress Infringement (Fifth Claim for Relief), Copyright Infringement (Sixth
through Seventeenth Claims for Relief), Design Patent Infringement (Eighteenth Claim for
Relief), Common Law and New York Unfair Competition (Twentieth and Twenty-Second
Claims for Relief) and Deceptive Trade Practices (Twenty-First Claim for Relief).

   ***Response of Yurman***:

   (64) Undisputed.

   65. As the basis of its trademark infringement, false designation of origin, false
advertising, trademark dilution and unfair competition claims, Yurman alleges that on the web-
site Overstockjeweler.com Ejeweler and Castaneda unlawfully employ their trademarks David
Yurman and The Cable Collection, The Thoroughbred Collection, Silver Ice and Albion, the
names of a number of Yurman jewelry collections, to describe the jewelry products they sell on
the site. (Amended Yurman Complaint, paras. 10-15). In its Complaint, Yurman has also
asserted claims for trade dress infringement, claiming it owns the trade dress in twenty-two (22)
of its designs. (Amended Yurman Complaint, paras. 16-18).

   ***Response of Yurman***:

   (65) Yurman disputes that the only alleged basis for its trademark infringement, false

designation of origin, false advertising, trademark dilution and unfair competition claims, is that

Defendants unlawfully employ its trademarks David Yurman and The Cable Collection, The

Thoroughbred Collection, Silver Ice and Albion, and the names of a number of Yurman jewelry

collections, to describe the jewelry products they sell on Overstockjeweler.com. For example,

Yurman's false advertising claims are also premised on Defendants' use of fictitious "list prices"

and misrepresentation of the quality of the products they sell. (First Amended Complaint

(Yurman)).

66.    Yurman bases its copyright infringement claims upon twelve (12) separate U.S. Copyright Registrations, six (6) of which are for single jewelry designs and six (6) of which are for groups of jewelry designs. (Amended Yurman Complaint, paras. 20-23). The U.S. Copyright Office issued Yurman copyright registrations for six (6) individual jewelry designs, Registration No. VA 771-476 for 'Bracelet B06195', Registration No. VA 1-024-278 for 'Albion Collection Necklace N06261', Registration No. VA 785-338 for 'Earrings E06190', Registration No. VA 1-024-276 for 'Pave Collection Enhancer D06384', Registration No. VA 1-024-280 for 'Hampton Collection Enhancer D06377' and Registration No. VA 1-024-281 for 'Hampton Collection Necklace N06379', which Yurman has asserted against Ms. Castaneda and Ejeweler. It has also issued Yurman copyright registrations for six (6) of its jewelry collections, its 'Albion Collection', Registration No. VA 1-116-155, 'Linked Renaissance Collection 2005', Registration No. VA 1-384-012, 'Crossover Collection', Registration No. VA 1-282-478, 'Capri Collection', Registration No. VA 1-094-336, 'Madison Chain Collection', Registration No. VA 1-282-481 and 'Pearl Collection I 2005', Registration No. VA 1-390-915. (Exh. Q). Each of these collections contain a large number of different jewelry pieces, including bracelets, necklaces, rings and earrings. Many of the jewelry items sold by Overstockjeweler.com whose copyright Yurman claims to be infringed are part of one of these collections which are covered by Yurman's group copyright registrations. (Amended Yurman Complaint, paras. 84-90, 91-97, 119-125, 126-132, 133-139, 140-146).

_**Response of Yurman**_:

(66)    Yurman disputes the contention that "many" of the jewelry items sold by

Defendants whose copyright Yurman claims to be infringed are covered by collection

registrations as opposed registrations for individual works. (First Amended Complaint

(Yurman)).

67.    On September 6, 2007, Cartier and associated entities Cartier International, N.V. and Cartier Creation Studio, S.A. (collectively "Cartier"), Van Cleef & Arpels S.A. and associated entities Van Cleef & Arpels, Inc. and Van Cleef & Arpels Distribution, Inc. (collectively "Van Cleef"), Gucci America, Inc. ("Gucci") and Bulgari S.p.A. ("Bulgari") filed a Complaint, which they later amended, against Ejeweler and its proprietor, Elena Castaneda. Cartier, Van Cleef, Gucci and Bulgari each asset claims for Trademark Infringement, False Designation of Origin, False Advertising, Trademark Dilution, Copyright Infringement, Common Law and New York Unfair Competition and Deceptive Trade Practices. Cartier and Bulgari have also asserted claims for design patent infringement. (Amended Cartier Complaint, paras. 149-154, 333-338). And Van Cleef has also asserted claims for trade dress infringement, claiming it owns the trade dress in seven (7) of its designs. (Amended Cartier Complaint, paras. 210-216).

***Response of Plaintiffs***:

(67)    Undisputed.

68.    As the basis of their trademark infringement, false designation of origin, false advertising, trademark dilution and unfair competition claims, Cartier, Van Cleef, Gucci and Bulgari each allege that on the web-site Overstockjeweler.com Ejeweler and Castaneda unlawfully employ their trademarks; Cartier, Love Bracelet, Trinity, Panthere, Lanieres, Agrafe, Tank, Pasha and Tankissime for Cartier; Gucci and 'G' for Gucci; Bvlgari, B.zero! and Parentisi for Bulgari; and Van Cleef & Arpels and Alhambra for Van Cleef. (Amended Cartier Complaint, paras. 19-23, 41-47, 60-64, 76-81).

***Response of Plaintiffs***:

(68)    Plaintiffs dispute the contention that Cartier, Van Cleef & Arpels, Gucci and

Bulgari's trademark infringement, false designation of origin, false advertising, trademark

dilution and unfair competition claims are premised only on the registered trademarks listed

above.  Plaintiffs have numerous other registered and unregistered word and design marks,

which are referenced in the Complaint, that they are asserting claims with respect to.  Moreover,

Plaintiffs' false advertising claims are also premised on Defendants' use of fictitious "list prices"

and misrepresentation of the quality of the products they sell.  (First Amended Complaint

(Cartier, *et al.*)).

69.    Bulgari bases its copyright infringement claims upon eight (8) separate U.S. Copyright Registrations, each of which is for the text and photograph in one of its catalogs. (Amended Cartier Complaint, paras. 82-86).  Registration No. VA 1-363-607 is for 'Bvlgari Jewellery stores 2006/2007', Registration No. VA 1-351-532 is for 'Bvlgari Christmas Catalogue 2005', Registration No. VA 1-287-644 is for 'Bvlgari Holiday Catalogue 2004', Registration No. VA 1-234-726 is for 'Bvlgari Catalog Allegra 2003', Registration No. VA 1-214-222 is for 'Bvlgari Catalog Ceremonies', Registration No. VA 1-132-583 is for 'Bvlgari Catalog Jewelry 2002/2003', Registration No. VA 955-884 is for 'Bvlgari Contemporary Italian Jewellers Holiday Catalog 1999', and Registration No. TX 5-263-543 is for 'Bvlgari Jewellery Collection 2000'. (Exh. R).  Each jewelry item upon which Bvlgari bases the copyright infringement claims it asserts against Ms. Castaneda and Ejeweler is contained in one of these catalogs. (Exh. R).

***Response of Bulgari***:

(69)    Bulgari disputes the contention that its copyright registrations for catalogs of its

jewelry designs cover only the text and photographs contained therein, and not the designs themselves. (Fioruzzi Decl. ¶¶ 4-10).

70. Gucci bases its copyright infringement claims upon two (2) separate U.S. Copyright Registrations, each of which is for large groups of jewelry designs. (Amended Cartier Complaint, paras. 271-78). The U.S. Copyright Office has issued Gucci copyright registrations for its 'Fall Winter 2005 Jeweler Collection', Registration No. VA 1-375-802, and its 'Spring Summer 2007 Jewelry Collection', Registration No. VA 1-395-947. (Exh. S). Both of these collections contain a huge number of vastly different jewelry pieces, including bracelets, necklaces, rings and earrings. (Exh. S). Each jewelry design upon which Gucci bases the copyright infringement claims it asserts against Ms. Castaneda and Ejeweler is part of one of these collections.

### *Response of Gucci*:

(70) Gucci disputes Defendants' characterization of the jewelry pieces contained in

Gucci's "Fall Winter 2005 Jeweler Collection" and "Spring Summer 2007 Jewelry Collection"

as "huge" in number and "vastly different." (Zarin Decl. Exh. S).

71. Cartier and Van Cleef base their copyright infringement claims upon French Copyrights, which they allege they own and obviate the need for them to obtain U.S. copyright registrations to prosecute their infringement claims. (Amended Cartier Complaint, paras. 202-209, 134-148). Cartier also bases one of its copyright infringement claims upon a U.S. Copyright Registration, Registration No. VA 1-130-790, for a bracelet it calls 'Agrafe'. (Amended Cartier Complaint, para. 24-26).

### *Response of Cartier and Van Cleef & Arpels*:

(71) Undisputed.

72. Upon the parties' agreement, on October 2, 2007, the Court consolidated the actions filed by Yurman and by Cartier, Van Cleef, Gucci and Bulgari. Yurman, Cartier, Van Cleef, Bulgari and Gucci all request the Court to enjoin Ejeweler and Castaneda from using their trademarks on Overstockjeweler.com and from selling all those jewelry products which they have alleged to infringe upon their respective copyrights, design patents and trade dress.

### *Response of Plaintiffs*:

(72) Undisputed.

73. Overstockjeweler.com has ceased selling the jewelry items which Cartier and Bulgari alleged to infringe their design patents. (Exh. D). And for all the reasons articulated in Ejeweler and Castaneda's memorandum of law, as a matter of law, Overstockjeweler.com is not required to cease using Yurman, Cartier, Van Cleef, Bulgari or Gucci's trademarks or to cease

selling the jewelry products which Yurman, Cartier, Van Cleef, Bulgari and Gucci have alleged to infringe their copyrights and which Yurman and Van Cleef have alleged to infringe their trade dress. Ejeweler and Castaneda therefore move for summary judgment.

### *Response of Plaintiffs*:

(73)    Plaintiffs dispute that Overstockjeweler.com has ceased selling any jewelry and watch items which Cartier, Bulgari and Yurman have alleged to infringe their respective design patents at the time Defendants filed this motion. (Ederer Decl. ¶ 6(x), (xi), Ex. E). Plaintiffs further dispute that Defendants are entitled to summary judgment with respect to any of their claims.


Dated: New York, New York                ARNOLD & PORTER LLP
       July 3, 2008

                    By:                               
                             Louis S. Ederer
                             John Maltbie
                             Matthew T. Salzmann
                             399 Park Avenue
                             New York, NY 10022
                             (212) 715-1000

                             *Attorneys for Plaintiffs*