**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- x

YURMAN STUDIO, INC. and YURMAN
DESIGN, INC.,

                Plaintiffs/Counter-Defendants,

     - against -

ELENA CASTANEDA and EJEWELER LLC
d/b/a OVERSTOCKJEWELER.COM,

                Defendants/Counter-Plaintiffs.

------------------------------------------------------------- x
------------------------------------------------------------- x

CARTIER, a division of RICHEMONT NORTH
AMERICA, INC., CARTIER INTERNATIONAL,
N.V., CARTIER CREATION STUDIO, S.A., VAN
CLEEF & ARPELS S.A., VAN CLEEF &
ARPELS, INC., VAN CLEEF & ARPELS
DISTRIBUTION, INC., GUCCI AMERICA, INC.,
and BULGARI S.p.A.,

           Plaintiffs,

     - against -

ELENA CASTANEDA and EJEWELER LLC
d/b/a OVERSTOCKJEWELER.COM,

           Defendants.

------------------------------------------------------------- x

Civil Action No. 07-1241 (SAS)(HP)
(Action No. 1)

Civil Action No. 07-7862 (SAS)(HP)
(Action No. 2)

**DECLARATION OF BHARAT DUBE, ESQ. IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**


**EXHIBIT A**

Paris, le 30 juin 2008.

Je soussigné, Nicolas Binctin, Professeur de droit à l'Université de Poitiers, enseignant le droit d'auteur à l'Université de Poitiers et à l'Université Paris I Sorbonne - Panthéon, expose ce qui suit.

La société Cartier me sollicite afin que je lui fasse part de mon opinion juridique, en droit français, sur la question suivante :

Peut-on contester la qualité à agir en justice de la société Cartier, en contrefaçon, pour défendre, sur le terrain du droit d'auteur, la commercialisation de ses bijoux ?

Mon opinion est sollicitée en vue d'être communiquée aux débats dans le cadre de différents procès se déroulant aux Etats-Unis et portant sur la contrefaçon de différents modèles de bijoux créés et commercialisés par la société Cartier.

Cette question trouve en droit français une double réponse, établissant dans les deux cas l'intérêt à agir et donc la recevabilité de l'action en justice pouvant être engagée par la société Cartier. En effet, ainsi que nous allons le rappeler, d'une part, le bénéfice du régime des œuvres collectives rend la société Cartier titulaire *ab initio* des droits d'auteur sur les bijoux, ce qui en fait la seule recevable à agir en justice, d'autre part, une présomption de titularité des droits d'auteur sur les bijoux mis en circulation à l'initiative de la société Cartier joue pleinement en faveur de cette dernière.

## I/ La qualité d'œuvre collective

En vertu de cette qualification, la société Cartier est titulaire des droits d'auteur sur les bijoux qu'elle commercialise.

Il est possible de décrire le processus de développement et de création d'un bijou au sein de la société Cartier de la façon suivante. Dans le cadre de la conception de ses modèles, la société Cartier emploie des dessinateurs salariés travaillant exclusivement en équipe. Chaque équipe est en étroite relation et sous le contrôle permanent de la Direction générale de la société et de la Direction de la création. Ainsi, les créations et le travail des salariés créateurs sont toujours dictés par la direction de la société dans le cadre d'un processus créatif collectif où personne n'exerce de prééminence, la décision finale de commercialisation d'une création revenant toutefois au Président de la société Cartier. Une méthode stricte transparaît de l'organisation de la société, la création s'articulant autour de six temps successifs toujours sous le contrôle du Président de la société Cartier :

- la confection d'une étude de marché préalable par le service marketing de Cartier, mettant en avant les tendances en relation avec les collections existantes. Cette démarche permet de définir les modèles à créer ou à relancer afin de présenter une gamme de produits toujours en osmose avec les attentes du marché et en concordance avec les codes esthétique de Cartier.

-    la réalisation d'un *brief* marketing – issu du service Marketing – permet pour le travail interne de définir un contexte et des objectifs pour le projet créatif. Ce document présente les produits attendus, leur caractère, leur identité, leur positionnement dans le patrimoine de Cartier, cela au regard des modèles existant et des collections. Ce document est finalisé lors d'une séance de travail du Comité marketing réunissant la Direction générale, la Direction marketing et les chefs de groupe.
-    Le *brief* marketing finalisé est transmis pour une mise en forme des instructions au Département création. Il s'agit de réaliser de multiples dessins traduisant les lignes directrices du document marketing. Le travail des dessinateurs est donc guidé par des instructions précises et des objectifs prédéfinis. Les esquisses sont retravaillées de nombreuses fois, par des dessinateurs différents afin d'aboutir à une proposition intéressante. In fine, seul un nombre restreint de dessins est retenu, la sélection étant opérée par le directeur du Département création.
-    Le Comité de création reçoit alors les dessins sélectionnés et effectue à son tour un choix et valide un projet parmi l'ensemble des propositions.
-    Une fois la sélection du Comité de création effectué, le dessin est transmis aux services techniques de Cartier qui réalise, successivement, une maquette en volume puis des prototypes. A ce stade, des modifications esthétiques sont à nouveau apportées au produit en raison de l'apparition d'une troisième dimension de la création. La forme finale peut varier sensiblement des esquisses communiquées par le Comité de création, il n'y a pas uniquement une réplique fidèle de celles-ci. Ce travail de prototypage est réalisé sous le contrôle du Directeur de la création.
-    La création est tenue pour finalisée lorsque le prototype est validé par le Comité de création de la société Cartier.

Ce travail est un pur travail d'équipe, où les fonctions créatives et techniques s'imbriquent et se cumulent, prenant en considération l'histoire esthétique de la société et les attentes du marché et où la contribution de chacun à la création se fond dans un tout sans qu'il soit possible, au final, de faire la part de l'intervention de chacun dans l'esthétique du bijou finalisé, le Comité de création assumant collégialement la définition du bijou.

Selon l'article L.113-2 al. 2 du Code de la propriété intellectuelle, *« est dite collective l'œuvre créée sur l'initiative d'une personne physique ou morale qui l'édite, la publie et la divulgue sous son nom et dans laquelle la contribution personnelle des divers auteurs participant à son élaboration se fond dans l'ensemble en vue duquel elle est conçue, sans qu'il soit possible d'attribuer à chacun d'eux un droit distinct sur l'ensemble réalisé. »*

Au regard de l'organisation du travail pour le développement des bijoux au sein de la société Cartier et de la définition de l'article L. 113-2 du Code de la propriété intellectuelle, la qualification d'œuvre collective s'impose avec évidence. Le régime de l'œuvre collective permet une identification particulière du titulaire *ab initio* des droits d'auteur sur une œuvre, le droit d'auteur revenant non pas aux créateurs personnes physiques, mais à la personne qui a pris l'initiative de la création, qu'elle soit une personne physique ou une personne morale, telle la société Cartier International. Le bénéficiaire de cette fiction étant immédiatement titulaire des droits

2

d'auteur, il est libre d'en disposer auprès des tiers dans les conditions qu'il entend, tout comme il est libre de les exploiter ou de les défendre en justice.

Suivant la jurisprudence, cette qualification est retenue pour des créations les plus diverses telles que : un journal (Cass. civ. 1, 6 mai 1997, *D.* 1998 somm 190, obs. Colombet), une encyclopédie (Cass. Civ. 1, 1er juil. 1990, *D.* 1970 769), un dictionnaire (Trib. Com. Paris, 5 janvier 1998, *RIDA* avril 1998, p. 474), ainsi que des bijoux (VAN CLEEF & ARPELS, TGI Paris, 15 septembre 1980 ; CA Paris, 26 avril 1982, *PIBD* n° 309 – III- 205 ; TGI Paris, 24 juin 2008, RG 06/1599)

Dans le cas particulier de la société Cartier, la cour d'appel de Paris, dans un arrêt du 19 novembre 1991 (CA Paris, 19 novembre 1991, « Cartier c/ Aurélien et autres », RG 90/014907 et 91/017090), a retenu la qualification d'œuvre collective au sujet des bijoux créés au sein de cette société.

Pour permettre la qualification d'œuvre collective, il est nécessaire qu'un maître d'œuvre ait pris l'initiative de la création et assumer les risques de sa diffusion. En pratique, le maître d'œuvre est la société qui réunit les compétences nécessaires pour permettre au terme d'un processus de développement et de confection de mettre sur le marché un produit nouveau, tel un bijou. Ce maître d'œuvre assume la direction de la création, laquelle postule un lien de subordination et de dépendance. Il donne les instructions orientant l'activité des personnes physiques, il sélectionne et corrige leur travail, il permet la réalisation de la création. Au terme de ce processus, comme l'impose l'article L.113-2 du Code de la propriété intellectuelle, cet entrepreneur prend l'initiative d'éditer, de publier, de divulguer le résultat de ce travail d'équipe. C'est bel et bien l'organisation du travail telle qu'on l'a comprise au sein de la société Cartier.

Pour pouvoir retenir la qualification d'œuvre collective, il faut plusieurs contributeurs dont chacune des contributions se fond dans un tout unique, le produit final commercialisé. Suivant ce régime, les contributeurs personnes physiques n'ont aucune vacation à un droit d'auteur sur le résultat final. Ainsi, celui qui a participé à l'élaboration d'un bijoux en proposant, à la demande de son employeur, une esquisse préliminaire, en s'inspirant des fonds historiques de la société éditant le bijou, verra sa proposition évoluer au gré d'échanges entre les membres d'une équipe composée de plusieurs designers, commerciaux, maquettistes, prototypistes, etc...et dirigée par un maître d'œuvre, ne saurait revendiquer la titularité du bijoux final résultant du travail de tous. Une fois encore, l'organisation du travail au sein de la société Cartier permet de penser que l'on doit retenir pour les bijoux créés la qualité d'œuvre collective, ce que confirme le jugement du 24 juin 2008.

Si une création est qualifiée d'œuvre collective, son régime est sensiblement aménagé par la loi. Suivant les dispositions de l'article L. 113-5 du Code de la propriété intellectuelle : « *l'œuvre collective est, sauf preuve contraire, la propriété de la personne physique ou morale sous le nom de laquelle elle est divulguée. Cette personne est investie des droits de l'auteur »*. Dès lors, les droits d'auteur naissent directement, *ab initio*, dans le patrimoine de l'entrepreneur sans qu'il soit nécessaire de passer par une cession de droits de propriété intellectuelle. Cette attribution des droits à la personne morale dans le cadre de l'œuvre collective se fait donc à titre originaire. Ainsi, la société Cartier est seule et unique titulaire des droits d'auteur sur

les bijoux créés pour son compte.

La conséquence principale de cette qualification, au regard de la recevabilité d'une action en contrefaçon engagée par la société Cartier est que, titulaire *ab initio* des droits d'auteur, la société est non seulement recevable à agir en contrefaçon, mais surtout, elle est la seule et unique titulaire des droits d'auteur sur les bijoux commercialisés et donc la seule a pouvoir agir légalement pour défendre les bijoux commercialisés.

## II/ La présomption de titularité des droits d'auteur lors d'une action en justice

Il ne fait pas de doute que la société Cartier soit recevable à agir en contrefaçon en sa qualité de titulaire des droits d'auteur sur des œuvres collectives. Toutefois, cette qualité à agir est renforcée par un second argument juridique, un argument procédural. En effet, la question de la qualité à agir en justice doit être distinguée de la question de l'identification de la personne physique auteur de l'œuvre, cette distinction est désormais fondamentale en droit français comme en droit communautaire de la propriété intellectuelle.

Si l'article L. 113-1 du Code de la propriété intellectuelle dispose que « *la qualité d'auteur appartient, sauf preuve contraire, à celui ou à ceux sous le nom de qui l'œuvre est divulgué* », cette disposition n'est cependant applicable qu'à l'identification de l'auteur personne physique. Elle ne signifie nullement que seule une personne physique, identifiée comme auteur, peut agir en contrefaçon, encore moins écarte-t-elle l'action en contrefaçon engagée par des personnes morales. Une telle interprétation serait contraire au droit d'auteur français. La personne morale exploitant légitimement une œuvre appropriée par un droit d'auteur est recevable à agir en justice.

Il n'est en aucun cas nécessaire qu'une personne physique, auteur, intervienne à l'instance pour rendre recevable l'action en contrefaçon engagée par l'exploitant légitime. Il est aujourd'hui de jurisprudence constante, en droit français, de le tenir pour légitime titulaire des droits d'auteur, sans avoir à apporter d'éléments de preuve particuliers. Il s'agit d'une présomption de titularité des droits d'auteur résultant des actes d'exploitation emportant une recevabilité de l'action en contrefaçon, cette présomption prétorienne a pour objectif de renforcer la lutte contre la contrefaçon et permettre aux exploitants légitimes de ne pas voir contester leur qualité à agir en justice sur le terrain du droit d'auteur, peu importe l'identité réelle de l'auteur personne physique.

La Cour de cassation confirme année après année cette présomption de titularité des droits d'auteur. Pour ne reprendre que les principales décisions sur les dix dernières années, on note notamment :

- un arrêt de la Première Chambre civile de la Cour de cassation, du 13 octobre 1998 (Bull. 1998, I, n° 293 p. 203) avance qu'« *une société fabriquait et diffusait des meubles qui avaient fait l'objet d'une reproduction quasi servile, il se déduit qu'elle était présumée titulaire, sur les produits litigieux, des droits de propriété incorporelle de l'auteur, et partant, recevable à invoquer la contrefaçon* ».

4

- un arrêt du 11 mai 1999 (Bull. 1999, I, n° 157 p. 104), par lequel la Cour de cassation affirme que « *en l'absence de toute revendication de la part de personnes physiques quant à la propriété intellectuelle sur une création, la société qui commercialise cette création sous son nom, est, du fait de ces actes de possession, et quelle que soit la qualification de l'oeuvre, présumée à l'égard d'une société tiers poursuivie pour contrefaçon, titulaire des droits de propriété incorporelle de l'auteur* ».

- Un arrêt du 22 février 2000 (Bull. 2000, I, n° 58 p. 40), la Première Chambre civile de la Cour de cassation affirme, dans un attendu de principe, « *qu'en l'absence de revendication du ou des auteurs, l'exploitation de l'oeuvre par une personne morale sous son nom fait présumer, à l'égard des tiers recherchés pour contrefaçon, que cette personne est titulaire sur l'oeuvre qu'elle soit, ou non, collective, du droit de propriété incorporelle de l'auteur* ».

- Un arrêt de la Chambre commerciale de la Cour du 20 juin 2006 (Bull. 2006, IV, n° 147 p. 156), reprend cette analyse en affirmant que « *viole en conséquence l'article L. 113-5 du code de la propriété intellectuelle la cour d'appel qui déclare irrecevable l'action en contrefaçon intentée par une personne morale, aux motifs que cette présomption suppose l'absence de revendication de l'auteur, ainsi que la justification de sa qualité par ce dernier, présent aux débats, alors qu'il n'était pas contesté que la société demanderesse exploitait les modèles sous son nom et que la personne physique se prétendant auteur ne faisait valoir aucune revendication contre elle, de sorte que cette société était présumée titulaire, à l'encontre des tiers poursuivis en contrefaçon, de droits indépendants de la réalité de la cession, comme de la présence de l'auteur aux débats ou du bien fondé de sa revendication personnelle au titre du droit moral* ». Cette décision confirme qu'il n'est pas nécessaire pour que l'action soit recevable que des personnes physiques soient présentes à l'instance en qualité d'auteur.

On relève que cette présomption de titularité des droits d'auteur est mise systématiquement en œuvre tant par la Première chambre civile de la Cour de cassation que par sa Chambre commerciale. Il y a une interprétation identique par ces deux chambres du droit d'auteur sur le terrain de la reconnaissance de la qualité à agir en contrefaçon au bénéfice d'une société qui exploite légitimement des modèles couverts par un droit d'auteur.

Outre la jurisprudence essentielle de la Cour de cassation, on peut aussi relever que les juges du fond appliquent avec la même régularité cette présomption de titularité pour recevoir les actions en contrefaçon portées devant eux. Sans établir une liste exhaustive, on peut citer, pour le cas particulier des bijoux, un arrêt de la cour d'appel de Paris du 27 septembre 2006 (RG 05/14327 ; *JurisData* n°2006-312807).

L'ensemble des décisions ici rappelées confirme l'analyse avancée : en l'absence de personnes physiques revendiquant le bénéfice de l'article L. 113-1 du Code de la propriété intellectuelle, l'exploitation de l'œuvre par une personne morale sous son nom fait présumer, à l'égard des tiers recherchés pour contrefaçon, que cette personne morale est titulaire, sur l'œuvre, du droit de propriété intellectuelle ; peu importe l'identité ou même l'identification de la ou des personnes physiques ayant

5

concourues à la création des œuvres contrefaites, que ces œuvres soient ou non des œuvres collectives.

Cette présomption prétorienne a pour objectif de renforcer la lutte contre la contrefaçon et permettre aux exploitants légitimes de ne pas voir contester leur qualité à agir en justice sur le terrain du droit d'auteur, peu importe l'identité réelle de l'auteur personne physique.

Si le droit français ne connaît pas la théorie du « *work made for hire* », des mécanismes de procédure offrent des effets juridiques similaires pour les exploitants, il en va ainsi de cette présomption de titularité des droits d'auteur. Dans ces conditions, pour écarter la recevabilité de l'action engagée par la société Cartier International, il est nécessaire pour la partie adverse de détruire cette présomption de titularité des droits d'auteur en apportant la preuve que la société Cartier n'est pas un exploitant légitime de ses propres bijoux. A défaut de rapporter une telle preuve, il ne sera pas possible de contester la recevabilité de l'action engagée par la personne morale.

Enfin, à l'appui de cette présomption prétorienne, il faut ajouter que la Directive européenne 2004/48 du 29 avril 2004 (*JOUE* n° L. 157, 30 avril, Rect. *JOUE* n° L. 195, 2 juin) dispose en son article 5, intitulé « *Présomption de la qualité d'auteur ou de titulaire du droit* » que aux fins des mesures, procédures et réparations prévues par la directive, les titulaires des droits d'auteur sont, jusqu'à preuve du contraire, considéré comme tel et admis en conséquence à exercer des poursuites contre les contrefacteurs, dès lors que leur nom est indiqué sur l'œuvre de manière usuelle. L'intégration de cette présomption dans la Directive communautaire tendait à la communautarisation d'une règle déjà admise dans les différents pays de l'Union Européenne confirmant ainsi la force de la présomption retenue par les juridictions nationale.
La société Cartier applique son nom, de manière constante sur l'ensemble des produits qu'elle commercialise. Donc, suivant la présomption avancée par la Directive, similaire à la présomption prétorienne développée en droit français, sauf à rapporter la preuve contraire, la société Cartier doit être tenue pour titulaire des droits d'auteur sur les bijoux qu'elle commercialise et pouvoir exercer pleinement toute poursuite en justice contre des contrefacteurs.

6

**Dans ces conditions, il ne fait aucun doute, qu'au regard du droit français, tant du droit d'auteur que du droit processuel, que la société Cartier est parfaitement légitime et recevable à agir en justice, en contrefaçon, pour défendre les modèles de bijoux qu'elle commercialise ; tout moyen de défense fondé sur une éventuelle irrecevabilité à l'action en raison du régime du droit d'auteur serait écarté par le juge.**

**Il n'est pas possible de déclarer irrecevable à agir la société Cartier car elle est seule titulaire du droit d'auteur, aucune autre personne n'est recevable à agir à sa place.** Il n'est possible pour écarter l'action de la société Cartier que de contester l'existence des droits d'auteur sur les bijoux en cause, soit, suivant le droit d'auteur français, contester le caractère original des bijoux commercialisés, contestation qui relève non pas de la recevabilité de l'action mais du débat au fond.

Nicolas Binctin
Professeur de droit à l'Université de Poitiers
Membre du l'Unité Mixte de Recherche CNRS - Cecoji

7

Paris, 30 June 08.

I the undersigned, Nicolas Binctin, Professor of law at the Université de Poitiers, a lecturer of copyright at the Université de Poitiers and the Université Paris I Sorbonne - Panthéon, hereby state the following:

Cartier has requested that I give them my legal opinion concerning French law on the following matter:

Can one challenge the capacity of Cartier to sue for infringement of copyright in order to defend the marketing of its jewellery under the scope of copyright?

My opinion has been requested in view of being communicated in hearings in various proceedings taking place in the United States concerning the imitation of various models of jewellery designed and marketed by Cartier.

This question would have two replies in French law, whereby in both cases the capacity to take part in legal proceedings and the admissibility of the legal proceedings which can be undertaken by Cartier are established. Indeed, as we shall recall, on the one hand, the rights of the collective work system makes Cartier the owner *ab initio* of copyright over the jewellery, which makes it the sole party with admissibility to take legal proceedings and on the other hand the assumption of ownership of copyright over the jewellery put into circulation on the initiative of Cartier applies fully in favour of this latter.

## I. The status of collective work

By virtue of this status, Cartier is the owner of the copyright of the jewellery that it markets.

It is possible to describe the development and design processes of jewellery in Cartier as follows. Within the scope of the design of its models, Cartier employs salaried designers who work exclusively in teams. Each team works closely together and under the permanent supervision of the Company's General Management and Design Management. Furthermore, the designs and work of the salaried designers are always motivated by Company Management under the scope of a collective creative process where nobody takes pre-eminence, with the final decision concerning the marketing of a design always falling to the Chairman of Cartier. There is a strict method within the company's organisation, with creation being based on six successive stages which are always under the supervision of the Chairman of Cartier:

- The production of a prior market study by the marketing department of Cartier, putting forward the trends in relation to existing collections. This step allows for a definition of the models to be designed or re-launched in order to present a range of products which are constantly in line with market expectations and in agreement with Cartier's aesthetic codes.
- The carrying out of a marketing brief - from the Marketing Department – allows the definition, for internal work, of the context and the objectives for the

1

creative project. This document presents the products affected, their nature, identity, positioning in Cartier's goods, with respect to the existing models and collections. This document is completed during a Marketing Committee work session bringing together General Management, Marketing Management and the Group Managers.

- The completed marketing brief is transmitted executing the instructions to the Design Department. This stage involves making various designs conveying the guidelines of the marketing document. The designers' work is therefore guided by precise instructions and predefined objectives. The sketches are reworked on numerous occasions by different designers in order to end in an interesting proposal.   At the end, only a limited number of designs are kept, with the choice being made by the Director of the Design Department.
- The Design Committee then receives the chosen designs, makes their selection and approves a project from among the proposals.
- Once the Design Committee has made their selection, the design is sent to Cartier's technical department which successively makes a three-dimensional model of the prototypes. At this stage, the aesthetic changes are again made to the product in a three-dimensional design. The final form may vary roughly from the sketches communicated by the Design Committee; there is not an exclusive true replica of these. This prototype work is carried out under the supervision of the Design Management.
- The design is considered as finalised when the prototype is approved by Cartier's Design Committee.

This work is pure team work, in which the creative and technical functions are interwoven and are combined, taking into consideration the aesthetic history of the company and market expectations. The contribution of each person to the design is based on a whole without it being possible in the end to separate the part of each person's intervention in the design of the completed jewellery, with the Design Committee collectively assuming the definition of the jewellery.

According to Article L.113-2 al. 2 of the Intellectual Property Code, "*collective work is defined as a work created on the initiative of a physical or legal person that edits, publishes and divulges it in its own name and in which the personal contribution of the various authors participating in its production is based on the whole in view of which it is designed, without it being possible to attribute to each of them a separate right on the whole carried out*".

With respect to the organisation of the work for the development of the jewellery in Cartier and the definition of Article L. 113-2 of the Intellectual Property Code, the determination of collective work is established with proof. The rules governing collective work allow specific identification of the owner *ab initio* of copyright over a work, with the copyright not being passed onto designers who are physical persons, but to the person who has taken the initiative for the design, whether it is a physical or legal person, such as Cartier International. The beneficiary of this fiction immediately being the owner of the copyright, it is free to dispose of these rights with respect to third parties under the conditions that it considers, as it is free to use these rights or defend these before the courts.

In accordance with case-law, this determination is held for the most diverse of

designs such as: A newspaper (Court of Cassation, Civil, 1, 6 May 1997, D 1998 summary 190, see Colombet), an encyclopaedia (Court of Cassation, Civil, 1, 1 July 1990, *D*. 1970 769), a dictionary (Commercial Court, Paris, 5 January 1998, *RIDA* April 1998, p. 474), in addition to jewellery (VAN CLEEF & ARPELS, Court of First Instance, Paris, 15 September 1980 ; Court of Appeal, Paris, 26 April 1982, *PIBD* No 309 – III- 205 ; Court of First Instance, Paris, 24 June 2008, RG 06/1599)

In the specific case of Cartier, the Court of Appeal of Paris, in a hearing of 19 November 1991 (Court of Appeal, Paris, 19 November 1991, "Cartier vs Aurélien et al.", RG 90/014907 and 91/017090) maintained the determination of collective work concerning jewellery designed within that company.

In order to allow the determination of the collective work, it is necessary that a project manager has taken the initiative for the design and assumed the risks of its diffusion. In practice, the project manager is the company that combines all of the necessary skills in order to allow the introduction of a new product on the market, such as jewellery, at the end of a development and production process. This project manager takes on the management of the design, which applies a link of subordination and dependence. He gives the instructions deciding on the activity of physical persons, selects and corrects their work, and allows the execution of the design. At the end of this process, as stipulated in Article L. 113-2 of the Intellectual Property Code, this contractor takes the initiative of editing, publishing, divulging the result of this work team. This is well and truly the organisation of the work as it is comprised within Cartier.

In order to maintain the determination of collective work, it is necessary to have several contributors with each contribution being based on a single whole, the final marketed product. In accordance with this system, the contributors who are physical persons do not have claim to copyright on the final result. Furthermore, that person who has participated in the production of a piece of jewellery by proposing, at the request of their employer, a preliminary sketch, drawing their inspiration from historical collections of the company editing the piece of jewellery, shall see their proposal evolving through exchanges between the members of a team made up of several designers, sales people, graphic image reproducers, prototype designers, etc.... and managed by a project manager, would not be able to claim authorship of the final jewellery resulting from everyone's work. Once again, the organisation of the work carried out in Cartier would allow you to believe that the determination of collective work for the jewellery designed is maintained, a point confirmed in the judgment of 24 June 2008.

If a design is determined to be a collective work, the regulations governing it are noticeably set out by the law. In accordance with the provisions of Article L. 113-5 of the Intellectual Property Code: *"the collective work is, without proof of the contrary, the property of the physical or legal person on whose behalf it is disclosed. This person is invested with copyright".* Henceforth, copyright directly lies, ab initio, in the goods of the contractor, without it being necessary for an assignment of intellectual property rights to take place. This allocation of rights to the legal person under the framework of the collective work is done at original title. Thus, Cartier is the sole owner of the copyright on the jewellery designed on its behalf.

3

The main consequence of this determination with respect to the admissibility of an action for infringement undertaken by Cartier is that, being an *ab initio* owner of the copyright, the company is not only admissible to sue for infringement but in particular, it is the sole holder of copyright on jewellery marketed and is the sole person with the legal capacity to defend the jewellery marketed.

## II. The assumption of the ownership of copyright during legal proceedings

There is no doubt that Cartier has the admissibility to sue for infringement in its capacity as owner of the copyright over the collective works. Nevertheless, this right to sue is reinforced by a second legal argument, a procedural argument. Indeed, a distinction must be made between the question on the right to sue and the question on the identification of the physical person who is the author of the work; this distinction is nevertheless fundamental in French law as in EC intellectual property law.

If Article L. 113-1 of the Intellectual Property Code stipulates that the "*authorship belongs, without proof of the contrary, to that person or those persons under whose name the work is divulged*"; however, this provision is only applicable to the identification of the author who is a physical person. In no way does it mean that only a physical person, identified as author, may sue for imitation nor does this rule out legal action for imitation undertaken by legal persons. Such an interpretation would be contrary to French copyright. The legal person legitimately exploiting a work which has copyright is allowed to take legal proceedings.

In no case is it necessary that a physical person, author, intervenes in the legal proceedings to make the action taken by the legitimate owner, admissible. It is established case law in French law to hold this person as legitimate owner of the copyright without having to provide specific elements of proof. There is an assumption of ownership of copyright resulting from acts of ownership making infringement proceedings admissible. This judicial assumption aims to reinforce the fight against counterfeiting and allows the legitimate owners to ensure their right to take proceedings is not disputed under the scope of copyright, regardless of the actual identity of the author who is a physical person.

The Court of Cassation confirms year after year this assumption of ownership of copyright. So as not to list the main decisions of the last ten years, we note in particular:

- a ruling of the first Civil Division of the Court of Cassation of 13 October 1998 (Bull. 1998, I, No 293 p. 203) states that "*a company made and distributed furniture which had been the subject of an almost slavish reproduction, it is inferred that this company was assumed to be the owner, over the products under dispute, of the incorporeal property rights of the author, and consequently, it has admissibility to cite imitation*".

- a hearing of 11 May 1999 (Bull. 1999, I, n° 157 p. 104), by which the Court of Cassation states that "in the absence of any claiming of responsibility on the part of the physical persons with regard to the intellectual property of a design, the company

4

that markets this design under their name is, due to this assumption of ownership, and regardless of the determination of the work, considered, with respect to a third party company sued for imitation, to be the owner holder of the incorporeal property rights of the author"

- a hearing of 22 February 2000 (Bull. 2000, I, n° 58 p. 40), the First Civil Court of the Court of Cassation confirms that, as a principle, « *in the absence of a claim from the author(s), the use of the work by a legal person under its name gives the assumption, with respect to third parties sued for imitation, that this person is the owner, over the work whether or not it is collective, of the incorporeal property rights of the author*".

- a hearing of the Commercial Court of the Court of 20 June 2006 (Bull. 2006, IV, No 147 p. 156), also considers this analysis stating that « *the court of appeal consequently breaches Article L. 113-5 of the Intellectual Property Code when it declares as inadmissible the action for infringement initiated by a legal person, for the reason that this assumption implies the absence of a claim by the author, in addition to the justification of its capacity by the latter, present at the hearings, while it was not disputed that the claimant company used the models in its own name and the physical person claiming to be author did not make any claim against it, in such a way that this company was assumed to be the owner, against the third parties who are being sued, of rights independent of the reality of the assignment, the presence of the author at hearings or the merits of its personal claim under moral rights* ». This decision confirms that it is not necessary for physical persons to be present at the hearing in the capacity of author so that the action is admissible.

We have shown that this assumption of ownership of copyright is systematically implemented both by the First Civil Division of the Court of Cassation and by the Commercial Division. There is an identical interpretation by these two divisions of copyright in the scope of recognising a company's right to take action for imitation when it legitimately uses the models covered by copyright.

In addition to the essential case law of the Court of Cassation, we can also state that the trial and appeal courts apply this assumption with the same regularity in order to receive actions to sue brought before them. Without establishing an exhaustive list, we can cite for the particular jewellery case, a hearing of the court of appeal of Paris of 27 September 2006 (RG 05/14327 ; *JurisData* No 2006-312807).

All of the decisions mentioned here confirm the analysis asserted : in the absence of physical persons claiming the right of Article L. 113-1 of the Intellectual Property Code, the use of the work by a legal person under its name gives the assumption, with respect to third parties being sued for imitation, that this legal person is the owner, over the work, of the intellectual property right : regardless of the identity or even the identification of the physical person(s) who have participated in the creation of these works, whether or not these works are collective works.

This judicial assumption has the aim of reinforcing the fight against counterfeiting and ensuring the legitimate users do not see their capacity to take proceedings concerning copyright, affected, regardless of the actual identity of the author that is a physical person.

If French law is not aware of the theory « work made for hire », the mechanism of proceedings offer similar legal effects for users, and accordingly there is the assumption of the ownership of copyright. Under these circumstances, in order to rule out the admissibility of the action initiated by Cartier International, it is necessary for the opposing party to destroy this assumption of the ownership of copyright by providing proof that Cartier is not the legitimate user of its own jewellery. In failure to provide this proof, it will not be possible to dispute the admissibility of the action initiated by the legal person.

Finally, in support of this judicial assumption, it must be added that European Directive 2004/48 of 29 April 2004 (*JOUE* No L. 157, 30 April, Rect. *JOUE* No L. 195, 2 June) states in Article 5, entitled « Assumption of the capacity of author or owner of a right » that at the end of measures, proceedings and compensation stipulated under the directive, the owners of copyright are, unless there is contrary proof, considered as such and consequently allowed to bring proceedings against counterfeiters, while their name is indicated on the work in the usual manner. The inclusion of this assumption in the EC directive leans towards having an EC guideline for a regulation already allowed in various European Union countries, thus confirming the force of the assumption held by the national jurisdictions.

Cartier applies its name constantly on the set of products that it markets. Therefore, following the assumption advanced by the Directive, similar to the legal assumption developed in French law, except in the case of providing contrary proof, Cartier must be considered the owner of the copyright over the jewellery that it markets, and it may fully exercise any legal proceedings against counterfeiters.

6

**Under these conditions, there is no doubt with respect to French law, both for copyright and procedural rights that Cartier is perfectly legitimate and has admissibility to take proceedings for imitation in order to defend the jewellery models that it markets ; any means of defence based on the possible inadmissibility of the action by reason of the rules governing copyright would be ruled out by the judge.**

**It is not possible to declare it inadmissible for Cartier to act because it is the sole owner of the copyright and no other person can act in its place.** It is only possible to rule out the action of Cartier by disputing the existence of copyright over the jewellery in question, i.e. in accordance with French copyright, disputing the original character of the jewellery marketed, a claim which does not concern the admissibilty of the action but the substance of the case.

Nicolas Binctin
Professor of law at the Université de Poitiers
Member of Mixed Research Unit CNRS - Cecoji

7